UNITED STATES of America, Plaintiff,

v.

Leonard PELTIER, Defendant.

Cr. No. C77–3003.

United States District Court,
D. North Dakota,
Southeastern Division.

May 22, 1985.

Lynn Crooks, Fargo, N.D., Richard Vosepka, Jr., Asst. U.S. Attys., Minneapolis, Minn., Evan Hultman, Sioux City, Iowa, Rodney Webb, U.S. Attys., Fargo, N.D., for plaintiff.

William Kunstler, New York City, John J. Privitera, Buffone & Privitera, PC, Washington, D.C., Lewis Gurwitz, Flagstaff, Ariz., Bruce Ellison, Rapid City, S.D., Vine V. Deloria, Tucson, Ariz., for defendant.

## MEMORANDUM AND ORDER

BENSON, Chief Judge.

On April 18, 1977, a jury found Leonard Peltier guilty on two counts of first degree murder for his participation in the murder of two FBI agents on the Pine Ridge Indian Reservation in South Dakota, in violation of 18 U.S.C. §§ 2, 1111, and 1114. The court of appeals affirmed the judgment of conviction on direct appeal. *United States v. Peltier*, 585 F.2d 314 (8th Cir.1978), *cert. denied*, 440 U.S. 945, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979).

On April 20, 1982, Peltier filed a motion to vacate the judgment and for a new trial pursuant to 28 U.S.C. § 2255. This court denied the motion on December 30, 1982, without holding an evidentiary hearing. *United States v. Peltier*, 553 F.Supp. 890 (D.N.D.1982). On appeal the court of appeals remanded for an evidentiary hearing limited to this court's consideration of testimony or documentary evidence relevant to the meaning of an October 2, 1975, FBI teletype, and its relation to the ballistics evidence introduced at Peltier's trial. *United States v. Peltier*, 731 F.2d 550, 555 (8th Cir.1984).[1] The court of appeals directed this court to rule on whether the evidence adduced at the hearing supports Peltier's contention that the government's nondisclosure of the October 2, 1975, teletype violated Peltier's due process rights under the doctrine of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), requiring a new trial. 731 F.2d at 555.

The mandated evidentiary hearing commenced before this court on October 1, 1984. The matter became at issue on May 10, 1985. FBI Special Agent Evan Hodge, the author of the October 2, 1975, teletype and presently the chief of the FBI Labo-

---

1. Defendant became aware of the existence of the teletype through a Freedom of Information Act action following his conviction.

ratory's Firearms and Tool Marks Division, was the only witness who testified at the hearing.[2] Hodge's testimony related to the procedures utilized by the FBI lab in processing the "reservation murders" (referred to as "RESMURS") evidence and the examinations that resulted in the October 2, 1975, FBI teletype.

The October 2, 1975, teletype reads in pertinent part:

RECOVERED .223 CALIBER COLT RIFLE RECEIVED FROM SA ——————— BATF, CONTAINS DIFFERENT FIRING PIN THAN THAT IN RIFLE USED AT RESMURS SCENE.

At trial the government, through independent evidence, linked an AR–15 .223 caliber Colt rifle, found later in an exploded car on a Wichita turnpike, as one that was in the possession of Peltier on the day of the murders. FBI Special Agent Evan Hodge testified at trial that a .223 bullet casing found in the trunk of Agent Coler's, one of the dead agents, car was positively identified by the extractor marks on the casing as having been extracted from the Wichita AR–15. Peltier argued in his motion to vacate judgment and for a new trial and on appeal of this court's denial of his motion, that the October 2 teletype meant the bullet casings found "at RESMURS scene," which Peltier argued included the .223 casing found in the trunk of Agent Coler's car, had been tested against the Wichita AR–15 with negative results. Such results would have discredited Agent Hodge's testimony at trial that no conclusion could be reached from a firing pin analysis of the Wichita AR–15 in relation to the alleged fatal bullets, and would have seriously undermined the inference, which the government urged the jury to draw from the positive extractor mark testimony given by Agent Hodge, that the Wichita AR–15 in fact fired the fatal bullets.

In the December 30, 1982, memorandum and order of this court, the court rejected Peltier's argument and held the October 2, 1975, teletype did not raise a question that was not presented to the jury at trial. 553 F.Supp. at 896. The basis for this holding was the conclusion that the October 2 teletype raised no more of an inconsistency with the February 10, 1976, lab report (Trial Ex. 192), which summarized the positive extractor evidence concerning the .223 casing found in Agent Coler's trunk, than the October 31, 1975, lab report (Trial Ex. 135), of which the government contends the October 2, teletype was an advance version and which was before the jury. *Id.* The court of appeals agreed with this court's ruling on Peltier's argument that a firing pin test done on the .223 casing found in the trunk of Agent Coler's car (Trial Ex. 34B) and the Wichita AR–15 (Trial Ex. 34A) was done before October 2, 1975, and proved negative. 731 F.2d at 554. The appellate court noted, however, that the interpretation of the trial court and Peltier was not the only one that could be drawn from the October 2 teletype. *Id.* The court stated, "Indeed, if this were the only interpretation which could be drawn, then that discrepancy had already been put before the jury and we find no need for further consideration of the issue." *Id.*

The Eighth Circuit expressed its concerns about other possible interpretations of the October 2 teletype as follows:

The teletype does not simply say that the firing pin test came up negative, however—it says that the AR–15 "contains [a] *different* firing pin than that in [the] rifle used at [the] RESMURS scene." [Emphasis added.] This language raises several possibilities not considered by the district court and not as readily explained away by the record as it presently exists. For example, the use of the word "different" could indicate that the FBI knew the firing pin in the damaged AR–15 had been changed after the June 26, 1975, murders. Such a discrepancy can be found nowhere else in

---

2. Defendant had an independent firearms expert present in the courtroom at the hearing, but he was not called to testify.

the record, and could raise questions regarding the truth and accuracy of Hodge's testimony regarding his inability to reach a "conclusion" on the firing pin analysis and his positive conclusion regarding the extractor markings.

We do not mean to imply that the October 2 teletype establishes that the motives or actions of any FBI agent or government prosecutor were improper. Further investigation into this matter may simply show that the use of the word "different" in the teletype was an inaccurate way of expressing exactly what the October 31 laboratory report said—that the AR–15 could not be positively matched with any of the casings which had been tested at that time based on firing pin comparisons. We think it inappropriate, however, to simply assume this resolution of the new discrepancy raised by the October 2 teletype without hard evidence one way or the other.

*Id.*

The government contends the October 2 teletype was an advance version of a laboratory report authored by Hodge dated October 31, 1975, and received in evidence at Peltier's trial as Defendant's Exhibit 135. The government contends none of the trial exhibit 34 series of shell casings, which included the .223 casing found in the trunk of Agent Coler's car (Q # 2628, Trial Ex. 34B), had been examined at the time either the October 2, 1975, teletype or the October 31, 1975, lab report was written. Only seven .223 casings identified in the FBI lab by Q numbers 100 through 105 and 130 had been examined by that time, and it was the results of these seven comparisons that formed the basis for Agent Hodge's conclusion in the October 2 teletype. Due to a distinctive mark on the primer of those seven .223 casings, Hodge determined they had not been fired by the AR–15 recovered in Wichita, identified in the lab as K–40 (Trial Ex. 34A), thus accounting for the wording "contains different firing pin" in the teletype. At some time later during the course of his examinations, Agent Hodge compared the .223 casing from the trunk of Agent Coler's car (Q # 2628, Trial

Ex. 34B) and determined it had been loaded into and extracted from the Wichita AR–15.

Peltier contends the October 2, 1975, teletype was referring to all the .223 casings recovered during the RESMURS investigation instead of merely the seven .223 casings urged by the government. As such, Peltier contends Agent Hodge perjured himself or intentionally misled the jury when he testified at Peltier's trial he was not able to reach a conclusion based upon the comparison of the firing pin impressions on the test specimens fired with the firing pin of the Wichita AR–15 and the .223 casing found in the trunk of Agent Coler's car. According to Peltier, the October 2 teletype brings into question the truth of Agent Hodge's testimony linking the .223 casing found in the trunk of Agent Coler's car to the Wichita AR–15.

### Findings Of Fact

From the testimony of Agent Hodge and the documents received in evidence at the evidentiary hearing and documents filed with the court, the court finds the following facts.

At the time of the RESMURS investigation in 1975 and 1976, Evan Hodge was an FBI laboratory firearms and tool marks examiner. As a firearms and tool marks examiner he received evidence sent to him by field agents, examined it to determine whether ammunition components had been fired from a particular firearm to the exclusion of all others, and reported his findings. At the hearing Agent Hodge described the FBI laboratory's handling of the .223 casing found in the trunk of Agent Coler's car (Trial Ex. 34B, Q # 2628) from the time it entered his hands in July 1975 until the final firearms comparisons were made in February 1976.

The Wichita AR–15 rifle and the .223 casing found in the trunk of Agent Coler's car were both part of the government's exhibit 34 series at trial. The items that compose the exhibit 34 series were received by the FBI laboratory and Agent Hodge in three different submissions. The first submission, containing several hundred shell

casings, was received by Hodge on July 5, 1975, from FBI Agents Cunningham and Fluharty. This submission included trial exhibits 34C, bullet casings from the 1976 Ford Galaxy (Q numbers 353, 356–377, and 399–410); 34D, the bullet casing from the 1966 Chevrolet Suburban (Q # 547); 34G, bullet fragments from Williams car (Q numbers 10, 15A, 15C, and 18); and 34H, the bullet fragment from the ground beneath the bodies of Williams and Coler (Q # 84). When received by Hodge, the items were in random order in paper or plastic bags and were accompanied by Agent Dean Howard Hughes's "green sheet" (Evid. Hrg.Ex. 9). The "green sheet" contained a description of each piece of evidence found by Hughes and indicated the items were found in the vicinity of the green house, Jumping Bull Hall area. The items in the first submission were cataloged by Hodge and Joseph Twardowski, his assistant, assigned Q and K numbers, and listed on Hodge's worksheet for a secretary to type the following day. The assigned Q numbers also were written on the "green sheet" that accompanied the evidence. The information contained on the worksheet included a list of the items received, the case number, when they were received, and the name of the person from whom they were received. The worksheet was used for inventory control purposes and was the first sheet of an examiner's laboratory notes. The information on the work sheet also was contained in the examiner's final lab report.

Q numbers from 1 through 1102 were assigned to the items in the first submission. Hodge was provided with no information regarding the items found by Hughes other than that contained in the "green sheet." The items were grouped and Q numbers assigned on the basis of where they were recovered, in what Hodge considered to be a logical order. Those recovered from Agents Williams and Coler's bodies were listed first, followed by the specimens found in their vehicles, the Dean Howard Hughes items, items from Tent City, and then items from other vehicles. The items received in the first sub-

mission were stored in Hodge's evidence cabinet until they were examined.

To avoid confusion, it is Hodge's ordinary practice to examine evidence in numerical order by Q number. He will deviate from this procedure and make exceptions when priority requests are brought to his attention by field agents. When an item of evidence is given priority treatment, it is because he has received a priority request by telephone, teletype, or airtel addressed to the laboratory and/or the general investigative division. Field agents often ask to have their lab work done first and Hodge is constantly asked for expedited reports. These routine urgings will cause Hodge to change the order of his examinations only when there is some urgency for the results. Examples of what Hodge considers urgent are evidence involved in cases going to trial soon and examinations needed to obtain a warrant or to keep an individual in custody.

Hodge's examination of the items received in the first submission commenced on July 6 or 7, 1975. Beginning with Q numbers 1 through 219, he compared the ammunition components with the firearms he had received. Hodge's findings with regard to these initial examinations were reported in a lab report dated August 5, 1975 (Trial Ex. 134; Evid.Hrg.Ex. 10). The last item examined in preparation for the August 5 report was Q # 219. Examination of the remainder of the items in the first submission was not completed until January 1976. Although the .223 casing from the trunk of Agent Coler's trunk (Q # 2628) had been received by the date of the August 5, 1975, report, it was not listed in the August 5 report.

The second submission, containing approximately 800 items, was received by Hodge from Rapid City on July 24, 1975. This submission included trial exhibits 34B, the bullet casing from the trunk of Coler's car (Q # 2628); 34E, the bullet casing from the loghouse near the crime scene (Q # 2536), and 34F, the bullet casing from the hood and top of the 1967 Ford at Tent City (Q # 2539). Hodge followed the same

pre-examination procedure with the items in the second submission as he had with those in the first submission. The items were inventoried and listed, Q numbers were assigned, the worksheets were typed up, and the items were stored in the evidence cabinet until examined.

When the bullet casing found in the trunk of Agent Coler's car was received with the other items in the second submission, no special attention was drawn to it by the field agents, and Hodge was not asked to give it priority treatment. Therefore, Hodge listed it during the ordinary course of listing the second submission items and assigned it Q # 2628. In examining the items in the second submission, Hodge generally followed his procedure of numerical examination by Q number, resulting in examination of Q # 2628 in December 1975 or January 1976. The .223 casing from the trunk of Agent Coler's car (Q # 2628) was not listed in a lab report until February 10, 1976.

The third submission, containing several firearms, was received by Hodge from Special Agent Mike Gammage, Bureau of Alcohol, Tobacco, and Firearms, on September 12, 1975. The weapons had been recovered by agents of the Bureau of Alcohol, Tobacco, and Firearms from a vehicle that had exploded near Wichita, Kansas. This submission included trial exhibit 34A, the .223 Remington Colt AR–15 rifle (identified in the FBI lab as K–40).

As of September 12, 1975, Hodge had received all the items of evidence contained in the exhibit 34 series. Due to numerous interruptions during the course of the RESMURS investigation, however, as of September 12, 1975, he had only examined the items in the first submission Q numbered 1 through 219. Interruptions included one day that Hodge was required to testify during the course of his examination of the items Q numbered 1 through 219, 12 testimony trips requiring a total of 23 days between August 1975 and February 1976, a five and one-half day trip to teach a class at the FBI training center in August 1975, and trips to Florida, New York, Texas, and Nebraska in September 1975, which required a total of 16 days. Additionally, Hodge received seven non-RESMURS submissions, containing approximately 6000 items, between July 5, 1975, the date of the first RESMURS submission, and July 24, 1975, the date of the second RESMURS submission. Hodge issued 17 formal non-RESMURS reports based upon his examination of these items between August 1975 and February 1976.

Because he had only examined items Q numbered 1 through 219 as of September 12, 1975, Hodge initially examined the Wichita AR–15 exemplars with only the seven .223 caliber (5.56mm) bullet casings among these items, Q numbers 100 through 105 and 130. Hodge testified the examination of cartridge cases is time consuming. It takes approximately two hours to do an initial, simple, one-shell, one-gun examination. In conducting his examinations, Hodge first examined the bullet casings to determine the caliber and manufacturer. He then examined the firearm to determine if there were residues and if it was in good working order and could be test fired. Then there are several comparisons to be made of the firing pin impressions, the breech face markings, the extractor markings, and in some cases, the ejector markings. All of these comparisons are done in one examination, and it would be very unusual to do them at different times.

The sequence of the mark comparisons varies from examiner to examiner. Hodge looks at the firing pin impression, primer, and breach face marks first. If these marks are not sufficient for identification, he looks at the ejector and extractor marks.

The Wichita AR–15, identified in the lab as K–40 (Trial Ex. 34A), had been badly burned in the fire and was not in firing condition when received by Hodge. It was charred, the plastic stock and handguard had melted away, and some of the aluminum parts had melted. Hodge, therefore, did not attempt to test fire the gun itself. Instead, he took the bolt out of the receiver and placed it in an FBI collection

AR–15 firearm (M–22) that had no connection with the RESMURS investigation. He did not dissemble the bolt, or in any way manipulate the firing pin. Although it had been through a fire, there was nothing about the Wichita AR–15 bolt that would lead Hodge to suspect the firing pin had been changed. Hodge test fired the M–22 rifle containing the Wichita AR–15 bolt twice and recovered the test specimen bullet casings, or exemplars.

Based upon a comparison of the microscopic marks on the exemplars and investigation specimens made by the firing pin, breach face, ejector, and extractor, Hodge could reach one of three possible conclusions: the specimen was loaded into, fired, ejected, or extracted from the weapon (a positive identification); the specimen was not loaded into, fired, ejected, or extracted from the weapon (a negative identification); or it is impossible to determine whether the specimen was loaded into, fired, ejected, or extracted from the weapon (a non-conclusion).

Hodge's examination of the firing pin and extractor marks on the Wichita AR–15 exemplars and the Q numbered 100 through 105 and 130 bullet casings resulted in a negative identification, as noted in the FBI lab worksheet dated September 12, 1975 (Evid.Hrg.Ex. 7). Hodge testified at the hearing that the firing pin in the Wichita AR–15 bolt was smooth, whereas the firing pin impression on the seven .223 casings he had tested had a cross imperfection and was very distinctive. It was on this basis Hodge could tell the firing pin in the gun that had fired these seven casings was different than the firing pin of the Wichita AR–15 (K–40).

Although he failed to specify by Q number the casings covered by the October 2, 1975, teletype, Hodge testified it was the results of the comparisons of Q numbers 100 through 105 and 130 and the Wichita AR–15 exemplars that he had preliminarily reported in the October 2, 1975, teletype (Evid.Hrg.Ex. 4). No .223 casings other than Q numbers 100 through 105 and 130 had been compared against the Wichita

AR–15 exemplars as of October 2, 1975. The term "RESMURS scene" used in the October 2 teletype was a shorthand term by which Hodge meant to refer only to the Q numbers below Q # 219 listed in the August 5, 1975, lab report, which lab report was specifically referenced in the October 2 teletype. At the time of the October 2 teletype Hodge thought the shell casings listed in the August 5, 1975, lab report with Q numbers below Q # 219 were the casings located closest to the actual murder scene. There were only seven .223 (5.56 mm) casings in that category of the August 5 lab report, those casings being Q numbers 100 through 105 and 130.

Due to the characteristic cross imperfection left by the firing pin in the weapon used to fire these seven casings, and the uncharacteristic smooth impression left on his exemplars by the firing pin in the Wichita AR–15, Hodge reported in the October 2, 1975, teletype that the Wichita AR–15 contained a "different firing pin" than that in the rifle used at the RESMURS scene. The term "different firing pin" in the teletype means the firing pin that made the impressions on Q numbers 100 through 105 and 130 was a different firing pin than the one that made the impressions on the Wichita AR–15 exemplars.

The October 2, 1975, teletype was followed by a formal lab report dated October 31, 1975, which was introduced at trial as Defendant's Exhibit 135. There were no other examinations pertaining to the Wichita AR–15 between the October 2 teletype and the October 31 lab report. In the October 31 report the term "RESMURS scene" was meant to refer only to the seven .223 casings Q numbered 100 through 105 and 130.

After comparing the Q numbered 100 through 105 and 130 bullet casings with the Wichita AR–15 exemplars, Hodge returned the Wichita AR–15 (K–40) to the Bureau of Alcohol, Tobacco, and Firearms, but retained the exemplars he had made, placing them in the file for future use as needed.

Later examinations of the remaining .223 bullet casings submitted in connection with

the RESMURS case resulted in approximately 114 positive identifications with the Wichita AR–15. Thirty-nine of these were introduced into evidence at Peltier's trial as part of the exhibit 34 series. One of these was the bullet casing found in the trunk of Agent Coler's car (Q #2628; Trial Ex. 34B). Hodge examined this bullet casing in December 1975 or January 1976. He was not able to reach either a positive or negative conclusion based upon a comparison of the firing pin impressions on Q #2628 and the Wichita AR–15 exemplars, because he was not able to identify a sufficient number of characteristics in the firing pin impression left on the exemplars. The extractor marks on the exhibit 34 series and the Wichita AR–15 exemplars were very characteristic due to their depth and roughness, however, and Hodge was able to conclude the extractor marks on the exhibit 34 series had been made by the Wichita AR–15 to the exclusion of all other weapons. The examinations of the firing pin impressions on the 114 casings did not produce any evidence inconsistent with the theory that the casings, and particularly the exhibit 34 series, had been fired from the Wichita AR–15. Hodge reported his findings with regard to the exhibit 34 series bullet casings in his January 13, 1976, (Evid.Hrg.Ex. 2) and February 10, 1976, (Evid.Hrg.Ex. 3; Trial Ex. 192) laboratory reports.

Because all the items contained in the exhibit 34 series, including exhibit 34B, were in Hodge's possession on October 2, 1975, Peltier's counsel attempted to demonstrate on cross-examination that the October 2 teletype covered those items as well. Peltier argues, without evidence to support the argument, that even if all the ammunition components in the first and second submissions had not been examined prior to October 2, Hodge had examined the .223 caliber components out of order due to either specific requests he had received from the field or his knowledge of the RESMURS investigation.

The documents received in evidence at the evidentiary hearing corroborate Hodge's testimony with regard to the meaning of the October 2 teletype. The October 2 teletype refers to Hodge's August 5, 1975, lab report. A number of .223 caliber (5.56 mm) bullet casings are listed in the August 5 lab report, but only the .223 casings with Q numbers 100 through 105 and 130 are listed under the heading "at scene." Documents filed with the court show Hodge and his assistant were consistent with the use of the term "RESMURS scene" to describe only Q numbers 84 through 219. Evid.Hrg.Ex. 22; 33 at pages 294, 307; 27 at pages 5, 6.

Hodge did not complete his examination of the RESMURS evidence until approximately nine months after the incident occurred due to the volume of RESMURS evidence received by him and his work on other cases, some of which were RESMURS related. Priority requests received in connection with items of RESMURS evidence interrupted Hodge's ordinary procedure of examining evidence in numerical sequence by Q number. Hodge received special requests to compare all .223 casings with the AR–15 found at Al Running's on September 11, 1975, (Evid.Hrg.Ex. 6), to examine a .32 caliber Harrington and Richardson 5 shot revolver (Evid.Hrg.Ex. 17), to compare the Portland AR–15 and 35 Remington semi-automatic Woods Master with the expended cartridge cases discovered during the RESMURS investigation (Evid. Hrg.Ex. 23), and to compare all .308 cartridge cases found at RESMURS scene with a .308 Winchester caliber Remington Model 760 carbine found in the vehicle that exploded on the Kansas Turnpike (Evid. Hrg.Ex. 32). Additionally, Hodge received a number of more general requests. See Evid.Hrg.Ex. 14, 19, 28, 29, and 35. Hodge specifically responded to some of these requests. For example, the October 2 teletype (Evid.Hrg.Ex. 4) was primarily concerned with the results of his examination of a .308 caliber rifle recovered from the Wichita explosion, and a November 24, 1975, teletype (Evid.Hrg.Ex. 22) reported the results of his comparison of an AR–15 from Portland, Oregon, with shell casings Q numbered 100 through 105 and 130, be-

cause, at that time, that was as far as his examinations had progressed. Hodge responded to many of the requests, however, by way of his laboratory reports.

Hodge never received a specific priority request to examine the .223 casing found in the trunk of Agent Coler's car (Q # 2628). Therefore, it was examined in the ordinary course of his work. He did, however, receive a specific request to compare the AR-15 from Wichita with Q numbers 356 through 377 (Evid.Hrg.Ex. 32). This request was not formally answered until Hodge issued his January 13, 1976, lab report. His response to this request was not contained, as defense counsel suggested, in the October 2, 1975, teletype.

Peltier argues Hodge had much information regarding the RESMURS investigation available to him, the knowledge of which caused him to examine all the .223 caliber ammunition components, including Q # 2628, and the AR-15 rifles he had received prior to October 2, 1975. The information available to Hodge included the following: a teletype dated June 27, 1975, indicating the pathologist's opinion that the agents were shot at point blank range with a high velocity shoulder weapon (Evid. Hrg.Ex. 13); a summary teletype dated September 20, 1975, indicating that suspect Al Running advised the FBI that the Wichita AR-15 was probably used by Leonard Peltier to kill the agents (Evid.Hrg.Ex. 14); a teletype dated July 10, 1975, indicating that one of the at least five different weapons used on Agent William's car was a .22 center fire caliber (Evid.Hrg.Ex. 16); and a teletype and memorandum, both dated September 24, 1975, indicating suspect Norman Brown saw Leonard Peltier, armed with an AR-15 or M-16, approach the agents with two other Indian men and then heard three shots (Evid.Hrg.Ex. 30 and 31).

Although Hodge was aware of the information regarding the investigation from Rapid City, the autopsy findings, and the fact that three AR-15's were possibly involved, this knowledge did not cause him to deviate from his general procedure of examining evidence numerically by Q num-

ber. Hodge was a firearms and tool marks examiner in the laboratory, not a field investigator. It was his job to analyze the evidence submitted to him in a careful, logical manner. The locations of the items submitted to him when found was irrelevant in his work, except as a means of grouping and identifying them in assigning Q numbers and writing his laboratory reports. Determinations regarding the evidentiary value of specific items were left to the field agents and government attorneys. Hodge knew all the evidence would eventually be examined, and because no specific priority request was received from the field with regard to Q # 2628, he examined it during the ordinary course of his lab work. The items submitted to the lab were, in a sense, all priority items, but it was not possible for him to examine them all immediately. Therefore, he examined the items the field agents designated as priority items first, and the remainder of the items as soon as he was able to get to them.

During the course of his examinations, Hodge was assisted by three laboratory personnel, Special Agents Twardowski, Albrecht, and Reidman. Hodge testified on cross-examination that the handwriting on his lab notes (Evid.Hrg.Ex. 33) concerning Q # 2628 was either his or that of his assistant Special Agent Twardowski. After the evidentiary hearing was initially closed, Agent Twardowski stated to Hodge that some of the writing was not his, and the evidentiary hearing was reopened. Hodge then recanted his earlier testimony, but he was unable to provide the court with the name of the person who had actually made the notes. Hodge did reaffirm at the reopened hearing that regardless of whose handwriting was contained in his notes, the conclusion stated in the report was based on his personal examination of Q# 2628 and the Wichita AR-15 exemplars. This rebuts any inference that the laboratory results with regard to the exhibit 34 series had been fabricated to wrongly convict Leonard Peltier.

The deposition of Special Agent William Albrecht was taken in Washington, D.C.,

on January 7, 1985. Agent Albrecht testified he made the lab notes concerning Q # 2628 on page 417 of Evidentiary Hearing Exhibit 33. Albrecht testified he did not make the notations on the photographic exemplar, which appears on page of 418 of Exhibit 33. Hodge had testified at the evidentiary hearing that he made the note on the photographic comparison himself. At the time Albrecht made these notes he was not a qualified firearms examiner, but rather an agent trainee. He had started with the FBI lab on October 29, 1975. As such, while Albrecht's preliminary findings in the lab notes concerning Q # 2628 are consistent with the conclusions in the February 10, 1976, lab report, the conclusions in the lab report are not Albrecht's, but rather, Hodge's. In addition, since Albrecht did not start working in the lab until October 29, 1975, Albrecht's notes concerning Q # 2628 could not have been written, and his examination of Q # 2628 was not done, before the time of the October 2, 1975, teletype at issue.

After having seen and heard Agent Hodge testify, it is the opinion of this court that Agent Hodge was a credible witness. The fact the hearing was reopened so that he could correct an error he had made in his earlier testimony adds to, rather than detracts from, his credibility.

From the testimony of Agent Hodge this court finds the meaning of the October 2, 1975, teletype to be as follows: The Wichita AR–15 (Trial Ex. 34A) contains an uncharacteristic smooth firing pin, whereas the weapon used to fire the Q numbered 100 through 105 and 130 bullet casings contains a different firing pin, with a characteristic cross imperfection. Therefore, the Wichita AR–15 could not be positively identified with any of the .223 bullet casings that had been tested as of October 2, 1975, those being the casings Q numbered 100 through 105 and 130, based on firing pin comparisons.

## Conclusions Of Law

 At the close of the evidentiary hearing, Peltier's counsel took the position he could not be barred from relitigating issues previously raised and decided adverse to him on appeal. This argument is without merit. *See Anderson v. United States*, 619 F.2d 772, 773 (8th Cir.1980). In addition, Peltier's other alleged Jencks Act violations and rule 16 violations have not been shown to be *Brady* violations, infringements of constitutional rights, or defects seriously affecting the fairness of the trial, and thus, cannot be raised in habeas corpus proceedings; they could be raised only on direct appeal. *See United States v. Houser*, 508 F.2d 509 (8th Cir.1974).

The evidentiary hearing in this case was held pursuant to the mandate of the Eighth Circuit Court of Appeals. The mandate remanded the case to this court for an evidentiary hearing specifically limited to consideration of testimony or documentary evidence relevant to the meaning of the October 2, 1975, teletype and its relation to the ballistics evidence introduced at Peltier's trial. Therefore, the court will only consider the issues raised and evidence presented at the evidentiary hearing relevant to the meaning of the October 2 teletype.

 After his appeal of this court's December 30, 1982, order denying his motion to vacate judgment and for a new trial, Peltier's remaining section 2255 claim is that the failure of the United States to provide him with a copy of the October 2, 1975, teletype prior to his criminal trial denied him due process protected by the fifth amendment to the United States Constitution. *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Whether the government's nondisclosure requires reversal depends upon the nature of the material and the specificity of defense requests for disclosure. If the undisclosed evidence demonstrates that the government's case included perjured testimony and that the prosecution knew or should have known of the perjury, the conviction "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342

(1976). In the absence of perjured testimony, if a specific request for evidence was made by the defense, but the exculpatory evidence was not given, the conviction must be overturned if "the suppressed evidence might have affected the outcome of the trial." *Id.* at 104, 96 S.Ct. at 2697–2698. If no request, or merely a general request for exculpatory evidence was made, nondisclosure will constitute constitutional error only if "the omitted evidence creates a reasonable doubt that did not otherwise exist." *Id.* at 112, 96 S.Ct. at 2401–2402.

Agent Hodge testified at Peltier's trial that he could not make a conclusive firing pin comparison between the Wichita AR–15 exemplars and the bullet casing found in the trunk of Agent Coler's car. Trial Transcript at 3234–35. It became apparent at the evidentiary hearing the reason for this was the firing pin in the bolt of the Wichita AR–15 was smooth and did not produce a sufficient number of characteristic marks on the exemplars for Hodge to be able to say the Wichita AR–15 had or had not fired the bullet casing found in the trunk of Agent Coler's car to the exclusion of all other weapons. In addition, the firing pin impression on the bullet casing found in the trunk of Agent Coler's car did not contain any unusual marks so that Hodge could conclude it had not been fired from the Wichita AR–15. The .223 bullet casings considered by Hodge to have been found "at the scene" and tested prior to October 2, 1975, were those with Q numbers 100 through 105 and 130. The firing pin impressions on those seven bullet casings did contain an unusual mark not found on the Wichita AR–15 exemplars. Therefore, Hodge was able to determine the Wichita AR–15 had not fired the casings Q numbered 100 through 105 and 130, even though the firing pin impression left on the Wichita AR–15 exemplars did not contain a sufficient number of characteristic marks.

■ On the basis of the foregoing, it is clear the October 2, 1975, teletype does not evince perjured testimony. The October 2, 1975, teletype only dealt with the results obtained by Hodge after comparing the firing pin impressions on the Wichita AR–15 exemplars with the firing pin impressions on bullet casings Q numbered 100 through 105 and 130. A comparison of the firing pin impressions on the Wichita AR–15 exemplars and the .223 casing found in the trunk of Agent Coler's car (Q # 2628) at a later date merely produced an inconclusive result, not a negative one. The extractor marks left on both the Wichita AR–15 exemplars and Q # 2628 were very characteristic due to their depth and roughness, and therefore, it was possible for Hodge to conclude the extractor marks on Q # 2628 had been made by the Wichita AR–15 to the exclusion of all other weapons.

■ In cases not involving the use of perjured testimony, the issue of whether the undisclosed evidence is sufficiently material to require its disclosure is determined by initially considering whether the defense made a specific or general request for its disclosure prior to trial. Applying either the specific or general request standards of materiality to the October 2, 1975, teletype, it is the opinion of this court that Peltier is not entitled to a new trial. The evidence produced at the evidentiary hearing established that the use of the word "different" in the October 2, 1975, teletype was merely an inaccurate way of expressing what the October 31, 1975, laboratory report (Trial Ex. 135) also meant to express—that the Wichita AR–15 could not be associated with any of the bullet casings that had been tested at that time based on firing pin comparisons. Therefore, the October 2, 1975, teletype can be considered preliminary information, which the prosecution had no obligation to disclose to the defendant. *Giles v. Maryland*, 386 U.S. 66, 98, 87 S.Ct. 793, 809, 17 L.Ed.2d 737 (1967).

■ In addition, the October 2 teletype is merely cumulative in relation to the evidence produced at Peltier's trial. The October 31, 1975, lab report, which had a meaning identical to the October 2, 1975, teletype in its statement that "none of the ammunition components recovered at the

RESMURS scene could be associated" with the Wichita AR–15, was introduced in evidence at the trial, as Defendant's Exhibit 135. A February 10, 1976, lab report stating that the .223 bullet casing found in the trunk of Agent Coler's car had been associated with the Wichita AR–15 was also admitted at trial, as Defendant's Exhibit 192. Agent Hodge testified at trial he did not examine the .223 bullet casing found in the trunk of Agent Coler's car until December 1975 or January 1976, thus explaining the discrepancy between the two reports. Trial Transcript at 3388. Therefore, the evidence at trial included the apparently inconsistent lab reports and Agent Hodge's testimony concerning the time he examined the .223 casing found in the trunk of Agent Coler's car for the jury's consideration.

Because the October 2, 1975, teletype, evaluated in the context of the entire record, would not have affected the outcome of the trial, and does not create a reasonable doubt that did not otherwise exist, Peltier has failed to establish constitutional error. The nondisclosure of the teletype did not violate the *Brady* doctrine. The record of the case as it presently exists conclusively shows Peltier is entitled to no relief.