Leonard **PELTIER,** Plaintiff–Appellant,

v.

**G.L. HENMAN, Warden, United States Penitentiary, Leavenworth, Kansas,** Defendant–Appellee.

No. 92–1129.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 9, 1992.

Decided July 7, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 12, 1993.

Ramsey Clark, New York City, argued, for plaintiff-appellant.

Lynn Crooks, Asst. U.S. Atty., Fargo, ND, argued, for defendant-appellee.

Before McMILLIAN, Circuit Judge, FRIEDMAN,* Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.

FRIEDMAN, Senior Circuit Judge.

For the second time, the appellant, Leonard Peltier, seeks by a proceeding under 28 U.S.C. § 2255 (1988) to set aside his 1977 conviction for the premeditated 1975 murder of two agents of the Federal Bureau of Investigation (FBI) during a shootout between the agents and Native Americans on the Pine Ridge Indian Reservation in South Dakota. The district court denied relief, ruling that (1) the record does not support Peltier's contention that an alleged concession by government counsel during oral argument before this court in the prior section 2255 appeal resulted in a change in the theory of the government's case and, therefore, produced a conviction that could not be supported by the evidence introduced at trial and (2) Peltier's other contentions—primarily that the government engaged in various kinds of misconduct in connection with the investigation and prosecution of the case—were not cognizable in this section 2255 proceeding because the contentions either were litigated, or could and should have been litigated, in the direct appeal of Peltier's conviction or the prior section 2255 proceeding.

We affirm.

I

A. The Murders, the Trial, and the Direct Appeal.

On June 26, 1975, FBI Agents Jack Coler and Ronald Williams entered the Pine Ridge Reservation in South Dakota with a warrant for the arrest of four Native Americans charged with armed robbery and assault with a deadly weapon. The agents followed a vehicle containing several men, one of whom the agents believed to be someone they sought under the warrant. Upon arriving at the reservation's Jumping Bull Compound, the Native Americans stopped their vehicle

and the agents also did so, stopping some distance from the suspect's vehicle.

A gun battle ensued from a distance between the individuals in the suspect's vehicle and others who gathered around the vehicle and the agents. Both agents were wounded, but were still alive as they lay on the ground. The agents were then shot in the head at point blank range with a high velocity, small caliber weapon, killing them instantly.

Four persons, including Peltier, were indicted for first degree murder in violation of 18 U.S.C. §§ 2, 1111 and 1114. Peltier then was a fugitive. Two of the defendants were tried and acquitted in the United States District Court for the Northern District of Iowa. The government dismissed the charges against the third defendant. Following the Iowa trial, Canadian authorities apprehended Peltier in Canada, and he was extradited to the United States.

In the United States District Court for the District of North Dakota (Benson, C.J.), a jury convicted Peltier on two counts of first degree murder. He was sentenced to two consecutive terms of life imprisonment. In a lengthy opinion that reviewed the evidence in considerable detail, this court unanimously affirmed the convictions. *United States v. Peltier*, 585 F.2d 314 (8th Cir.1978), *cert. denied*, 440 U.S. 945, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979). The court rejected Peltier's contentions (1) that evidence was improperly admitted, *id.* at 320–28, (2) that evidence designed to show that Peltier was the victim of an FBI frame-up was improperly excluded, *id.* at 330–34, and that proposed instructions reflecting that theory were improperly denied, *id.* at 328–30, and (3) that Peltier's extradition from Canada violated the Webster–Ashburton Treaty, Aug. 9, 1842, U.S.-Gr.Brit., art. 10, 8 Stat. 572. 585 F.2d at 334–35.

B. The First Section 2255 Proceeding.

Following our affirmance of the convictions on direct appeal, Peltier obtained a number of government documents under the Free-

---

* DANIEL M. FRIEDMAN, of the United States Court of Appeals for the Federal Circuit, sitting     by designation.

dom of Information Act (FOIA), 5 U.S.C. §§ 552, 552A (1982). Based on those documents, he filed a motion under 28 U.S.C. § 2255 for vacation of the judgment and a new trial. He asserted that the government's failure to disclose to him prior to trial documents that would have aided his defense, as it was required to do under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), denied him due process.

Although Peltier specified six categories of documents, his section 2255 claim focused particularly on an FBI teletype concerning what the government itself stated "was 'perhaps the most important piece of evidence in this case.'" *United States v. Peltier*, 800 F.2d 772, 775 (8th Cir.1986). That was a .223 bullet shell casing found in the open trunk of the murdered agents' car. The government introduced at trial through a ballistics expert evidence that linked the shell to an AR–15 rifle that evidence indicated Peltier had and used at the scene of the crime. Because the rifle had been badly damaged, it was impossible to determine whether the casing had been fired from that weapon. The ballistics expert, however, testified that the casing could be linked to the rifle by a firing pin analysis of the weapon. The government's theory at trial was that the casing had been ejected from the rifle into the trunk at the time the rifle was used to kill the agents.

One of the documents that the government gave Peltier under his FOIA request was the following FBI teletype, dated October 2, 1975 (slightly more than three months after the murders):

> RECOVERED .223 CALIBER COLT RIFLE RECEIVED FROM SA ____ BATF, CONTAINS DIFFERENT FIRING PIN THAN THAT IN RIFLE USED AT RESMURS SCENE. ["RESMURS" was the FBI acronym for the reservation murders investigation.]

Without a hearing and based on the parties' briefs, the district court denied the section 2255 motion. *United States v. Peltier*, 553 F.Supp. 890 (D.N.D.1982). The court concluded that the jury had heard conflicting evidence and had assessed the credibility of the witnesses. The court ruled that "[b]ecause the alleged nondisclosures, evaluated

in the context of the entire record, do not create a reasonable doubt as to petitioner's guilt that did not otherwise exist, no constitutional error, or even probability of constitutional error, has been established." *Id.* at 903.

On appeal, we upheld the district court's rejection without a hearing of all of Peltier's charges other than the ballistics one. *United States v. Peltier*, 731 F.2d 550 (8th Cir.1984) (per curiam). This court stated:

> After a careful review of the decision below and the record on appeal, we find no error in the district court's decision to dismiss without a hearing all allegations of purported prejudicial concealment by the government save the one example detailed in Peltier's brief and specifically argued to this Court. That example concerns the validity of FBI ballistics tests linking a .223 caliber bullet casing found during the investigation of the murders in question to an AR–15 rifle attributed to Peltier on the day of the killings.

*Id.* at 551–52.

The court remanded the case to the district court for an evidentiary hearing on that issue and then to determine "whether the evidence adduced below supports Peltier's contention that its nondisclosure violated the *Brady* doctrine, requiring a new trial." *Id.* at 555.

After a lengthy hearing, the district court denied Peltier relief. *United States v. Peltier*, 609 F.Supp. 1143 (D.N.D.1985). In a detailed discussion of the evidence presented in the hearing and at trial, the district court held that the October 2 teletype, evaluated in the context of the entire record, would not have changed the outcome of the trial. The court concluded that "[a]fter having seen and heard [ballistics expert] Agent Hodge testify, it is the opinion of this court that Agent Hodge was a credible witness." *Id.* at 1152. The court found that the teletype did not refer to the .223 casing found in the agents' car, but to other casings found at the scene.

On appeal, this court affirmed. *United States v. Peltier*, 800 F.2d 772 (8th Cir.1986), *cert. denied*, 484 U.S. 822, 108 S.Ct. 84, 98 L.Ed.2d 46 (1987). The court ruled that "the

prosecution withheld evidence from the defense favorable to Peltier, and that had [the teletype] been available to the defendant, it would have allowed him to cross-examine certain government witnesses more effectively." *Id.* at 775. We stated, however, that "[t]his case turns on the question whether the evidence withheld by the prosecution is material in the sense that its nondisclosure undermines confidence in the outcome of the trial." *Id.* This court concluded that

> [t]here is a *possibility* that the jury would have acquitted Leonard Peltier had the records and data improperly withheld from the defense been available to him in order to better exploit and reinforce the inconsistencies casting strong doubts upon the government's case. Yet, we are bound by the [*United States v.*] *Bagley* [473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)] test requiring that we be convinced, from a review of the entire record, that had the data and records withheld been made available, the jury *probably* would have reached a different result. We have not been so convinced.

*Id.* at 779–80.

C. The Present Section 2255 Proceeding.

Peltier's section 2255 motion filed in 1991 alleged that his conviction denied him due process on four grounds:

(1) an alleged government admission during oral argument before this court in the appeal in the prior section 2255 proceeding changed the government's theory of the case and eliminated the legal basis for his conviction;

(2) the district court improperly refused to permit him to present evidence of self-defense;

(3) the government engaged in serious misconduct in the case; and

(4) the government deliberately created an intimidating atmosphere at trial.

The district court, accepting and adopting the recommendations of the magistrate judge, denied a new trial. The court held that "[a] review of the record clearly indicates the government has never made admissions which changed its theory in this case,

as petitioner claims." The court held that Peltier's other claims were barred because they either had been or could and should have been raised and litigated in the prior direct appeal or the first section 2255 proceeding.

## II

Peltier contends that the government tried him and he was convicted solely on the theory that he personally shot the agents at point blank range; and that during the oral argument before this court in the prior section 2255 appeal, the government admitted that his conviction could not be sustained on that theory. Peltier maintains that this admission inferentially conceded that the only basis for his conviction was that he aided and abetted the killings—a theory which, Peltier contends, was injected into the case for the first time at that point. According to Peltier, the result was to destroy the basis upon which his conviction rested. Peltier further argues that the trial court improperly refused to permit him to introduce evidence supporting a self-defense claim—evidence that was irrelevant under the theory that he personally shot the agents at point blank range.

Peltier's arguments fail because their underlying premises are fatally flawed. (A) The government tried the case on alternative theories: it asserted that Peltier personally killed the agents at point blank range, but that if he had not done so, then he was equally guilty of their murder as an aider and abettor. (B) The government's statement at the prior oral argument, upon which Peltier relies, was not a concession that the government had not proved that Peltier had not killed the agents personally, and that Peltier's conviction could be sustained only on an aiding and abetting theory. (C) The evidence allegedly supporting Peltier's self-defense claim, which he claims was improperly excluded, was correctly rejected.

A. The indictment charged Peltier with violation of three sections of Title 18 of the United States Code: section 1111 (murder), section 1114 (murder of, among others, any officer or employee of the FBI), and section 2(a) ("Whoever commits an offense

against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.").

Defense counsel sought a bill of particulars asking whether "it [is] alleged that the Defendant fired the weapon with which [the agents were] killed or is it alleged that he aided, abetted, counseled, commanded, induced, procured or caused [their deaths]?" The government responded that "[w]hile the United States obviously has a theory of the case which we anticipate the evidence will substantiate, there is no way of knowing until the witnesses have actually testified, which of these two theories will be substantiated." Furthermore, the government pointed out that proof that Peltier was "[e]ither [the principal or an aider and abettor] would be sufficient to convict an individual of first degree murder." The district court denied the petitioner's motion.

In his opening statement, defense counsel explained:

Finally, if as the government has told you they will prove or expect to prove that one or more people shot and killed these two agents at very close range, it will be important for you to be able to determine whether anybody not actually close in, was around the edges, either knew this was taking place or was supporting or aiding and abetting them in some way, that would make them culpable.

Finally, it is possible, and we don't know what the government will argue, that the government will try to show some responsibility in Mr. Peltier for the conduct of others there.

Tr. at 34.

At the close of the government's case, defense counsel told the court:

The murders which have been proven in this case have been shown to be killings that took place at very close range. They were execution style murders and shooting from [a] distance could not constitute committing that act.

Well, the alternative argument in response to the defendant's position would be that that constituted aiding and abetting those who committed those murders.

Perhaps now it is clear to Your Honor why at the beginning of this case through an application for a Bill of Particulars we required the government to take some posture on the subject. They said in resisting that application that they didn't know how the testimony was going to go and perhaps they did not.

Tr. at 3422.

Counsel continued:

I'm in a somewhat difficult position as a lawyer because the government ... has to this moment not taken a position as to what their theory is of this particular case.

Now it seems to me that there are two possibilities, two realistic possibilities: either the government will ask the jury to believe that the defendant participated in the sense that he was in the proximity and either directly shot the agents or in someway at that location participated in the shooting of the agents which is perhaps two alternatives. But I see them in the terms of the distance between the defendant and the decedents as one alternative. That is to say, he was there and he either directly or by aiding and abetting then and there within ten or twelve or fifteen feet participated in the killing. That's one possible theory that the government could go to the jury on.

The other is that if the jury believes that he was shooting that afternoon, that because there was an ambush or some plan or perhaps at the last moment some decision to collectively assault these agents which resulted in their death and that the defendant did not come any closer while the significant shooting was going on at 200 yards, then it would seem to me the alternative argument to the jury is that they should find him guilty for aiding and abetting at a distance.

Tr. at 3447–48.

Defense counsel urged the court to require the government to elect between the two theories. The court responded: "It seems to me the government's response was to present all of the available relevant evidence and it's up to the jury to make the determination on the basis of that evidence whether one or

either of these situations [occurred]." Tr. at 3449.

Both the government and the defense submitted proposed jury instructions on aiding and abetting. Defense counsel, however, urged the court not to give the jury any aiding and abetting instruction. In response, the government supported such instruction:

With regard to the area of aiding and abetting, I would state that aiding and abetting is helping. Aiding and abetting is seeing to it or assisting someone in the commission of a crime. Now even if the jury did not believe that the defendant himself walked up to the agents and shot them from close range, from one foot or point blank range, they could nevertheless believe beyond a reasonable doubt under the state of the evidence that the defendant helped the person who did and the government is not required under the law in the eighth circuit to prove that this defendant actually pulled the trigger if the defendant is responsible in aiding and abetting. There is evidence to show circumstantial evidence by his contact both before and after the offense to prove that he aided and abetted those who were involved with him.

Tr. at 4929–30.

In closing argument, the government stated:

we have submitted strong circumstantial evidence which indicates that Leonard Peltier did in fact fire the fatal shots; but you need not believe that he did....

You need not believe beyond a reasonable doubt as I've just indicated to find him guilty beyond a reasonable doubt. We have proven beyond any doubt ... that this man is responsible for two dead human beings. There's nothing new or unusual about what I've said about responsibility, about aiding and abetting. I think all of you can reason for yourselves that if I hire someone to kill one of your jurors I pay a man to do a killing for me. There's no problem with anybody deciding that I'm guilty of murder.

Tr. at 4974.

We have proved that [Peltier] organized and directed this camp, started the fight,

fired at the agents again and again from the tree line.

Had we proved nothing further, that in itself would have been first degree murder; but in addition, we proved that he went down to the bodies and executed these two young men at pointblank range.

Tr. at 5019.

The court gave the jury four instructions on aiding and abetting. Instruction Number 38 explained: "The burden is on the Government to prove beyond a reasonable doubt, not only that the offenses were committed as alleged in the indictment, but that the defendant was the person who committed them, or aided and abetted the person or persons who committed them."

On direct appeal this court, in outlining the evidence, stated: "Viewed in the light most favorable to the government, the strongest evidence that Peltier committed or aided and abetted the murders is as follows...." 585 F.2d at 319 (footnote omitted).

The foregoing discussion establishes beyond question that from the beginning of this case through its submission to the jury (1) the government pursued alternative theories—that Peltier either himself directly killed the two agents, or aided and abetted others in doing so, (2) the defense was fully aware of these alternative theories and unsuccessfully attempted to compel the government to elect between them, and (3) the district court recognized the alternative theories and charged the jury in accordance with them.

Peltier seeks to support his position by reference to the following two passages in the opinion of this court in the prior section 2255 proceeding:

The record as a whole leaves no doubt that the jury accepted the government's theory that Peltier had personally killed the two agents, after they were seriously wounded, by shooting them at pointblank range with an AR–15 rifle.

800 F.2d at 772.

We could have resolved this issue without great difficulty if the government had presented the case against Peltier on the

theory that he was an aider and abettor. The evidence clearly shows that Peltier participated in the shoot-out that resulted in the wounding and ultimate deaths of the two FBI agents. But this is not the government's theory. Its theory, accepted by the jury and the judge, was that Peltier killed the two FBI agents at pointblank range with the Wichita AR–15.

*Id.* at 775.

The first passage states only that the jury accepted the government's theory that Peltier personally killed the agents; it does not say that that was the government's only theory. The second passage is inconsistent with this court's reference in the direct appeal to the evidence "that Peltier committed or aided and abetted the murders." 585 F.2d at 319. Moreover, this single statement cannot overcome the numerous statements by the government, the defense, and the district court recognizing that the government was asserting that Peltier either personally committed the murders or aided and abetted their commission.

█ B. At the oral argument in the prior section 2255 appeal, the following colloquy occurred between the court and the government attorney:

Judge Heaney: Just let me make myself a little more clear. It seems to me that this would have been an entirely different case, both in terms of the manner in which it was presented to the jury and the sentence that the judge imposed, if the only evidence that you have was that Leonard Peltier was participating on the periphery in the fire fight and the agents got killed. Now that would have been an entirely different case. But the evidence here is that the agents were killed at close range and that Peltier was at the vehicles so he could have done the killing and that even though somebody else may have pulled the trigger, he had the AR–15 and was there with these other two men and that therefore they were directly implicated. Because I doubt that if all he had been was like Brown who was also shooting, and a number of others who were also shooting from the periphery. I don't think this would have been the same case at all.

[Assistant United States Attorney] Crooks: Well, undoubtedly it wouldn't but I have no doubt whatsoever that we still would have convicted him. I think the best precedent that one can point to is the recent murder of our two marshals. We have exactly the same kind of situation. But we can't prove who shot those agents.

Unofficial Tr. at 18.

Peltier contends that by stating "we can't prove who shot those agents," government counsel conceded that the government had not proved that Peltier personally shot the FBI agents, and that he thereby recognized that the only basis for supporting Peltier's conviction was that he aided and abetted the murders.

First, as the district court recognized in this section 2255 proceeding, it is unclear whether the references to "those agents" was to the "two marshals" mentioned two sentences earlier who had recently been murdered, or to the two FBI agents killed in this case. In any event, this eight-word comment in response to Judge Heaney's statements, is a totally inadequate basis for asserting that the government conceded that it had not proved that Peltier personally shot the agents at close range, or that that was the sole basis upon which the government tried the case. Earlier in the argument, the government had stated several times that its theory was that Peltier was guilty of murdering the FBI agents because he either killed them personally or aided and abetted their killing:

Crooks: .... The case against Mr. Peltier was tried on the basis that he was shooting from the sidelines at least and that was first degree murder.

....

Judge Gibson: And how did the court instruct the jury?

Crooks: On aiding and abetting.

Judge Gibson: .... That's what I remember and I think that [the district court] instructed them both the aiding and abetting theory and the other.

Crooks: Absolutely. The case was basically tried with the assumption that we would

maybe not convince all those jurors that he was the one that pulled the trigger down by the bodies. Because as I've outlined in my brief the evidence is sketchy—even with that shell casing the evidence is sketchy on that subject. We would have been very foolish to rest our case on that theory alone. We tried our case on the theory that this man was ... shooting from the sidelines. We obviously then put in the evidence and you're certainly correct that the United States was arguing and hoping to convince the jury of further culpability.

....

Judge Ross: I'm not being critical because you have a right to rely on the theory of the case that you just described again and certainly if he was charged with murder and if the jury was properly instructed to, supplied with what it took to convict him of murder including aiding and abetting, then he could have been found guilty of murder. The only thing is as Judge Heaney points out the thrust of the original case, and I wrote the opinion, seemed to be that you were connecting Leonard Peltier directly with the murder and having fired the shots of the AR–15. Now I know you argued this to the jury, you argued this both ways.

Crooks: That's correct.

Judge Ross: But I know you did argue on the basis of being there and being at the scene of the rifle and just as guilty whether he fired the shot or not.

*Id.* at 16–18.

Immediately following the statement on which Peltier relies, the government reiterated that it had included the aiding and abetting theory in presenting the case to the jury:

Crooks: .... I simply wish to emphasize we are not arguing that that was not an important piece of evidence.... But I certainly am arguing that insofar as the United States was concerned this case was tried on an aiding and abetting type of theory. It wa [sic] argued that way it was tried that way.

Judge Heaney: Aiding and abetting Robideau and Butler?

Crooks: Aiding and abetting whoever did the final shooting. Perhaps aiding and abetting himself. And hopefully the jury would believe that in effect he did it all. But aiding and abetting nevertheless. That's the way I argued it I gave that argument and I remembered how we structured it. We structured it very carefully for that very reason that we were afraid that the jury would not feel there was enough evidence to find that he was the one—necessarily.

*Id.* at 18–19.

It is impossible to conclude that, in all the circumstances, Crooks, who had participated in the trial of the case, intended by his unartfully phrased statement "we can't prove who shot those agents," to abandon one of the two theories upon which the government had tried the case and upon which the case was submitted to the jury. More likely, he was merely reiterating that the government did not present any direct evidence that Peltier shot the agents at pointblank range, since all of the government's proof was circumstantial.

Indeed, if Crooks' statement were understood at the oral argument to be such a concession, one would have expected that, in his rebuttal argument, Peltier would have made the point that that statement changed the government's basic theory of the case. His rebuttal, however, did not mention that statement. At oral argument in the present appeal, he conceded that he had not raised the point in his petition for certiorari seeking review of our affirmance of the denial of his prior section 2255 motion.

We agree with the district court's statement in the present proceeding that "the government has never made admissions which changed its theory in this case." As the court stated

When the argument of government counsel before the Eighth Circuit is read in full, it is clear that the comment, "we can't prove who shot those agents," is taken out of context. The comment appears to relate to *United States v. Kahl* [748 F.2d 1204 (8th Cir.1984), *cert. denied,* 472 U.S. 1027, 105 S.Ct. 3501, 87 L.Ed.2d 632 (1985)], a case involving the murder of

federal marshals, not the murder of FBI Agents Coler and Williams in this case. The totality of the government's argument to the Court of Appeals does not retract one bit from the government's trial position that Peltier was at least guilty on an aiding and abetting theory, but that the evidence would support a finding that he was the executioner of the agents.

■ C. Peltier argues that the district court improperly refused to permit him to present evidence that any shooting he did at the two FBI agents from a distance was done in self-defense. He attempts to justify the belated raising of this claim on the ground that prior to the government's alleged concession in the oral argument at the appeal of the first section 2255 proceedings, he believed that the government's sole theory was that he shot the agents at point blank range; under that theory, of course, the alleged self-defense claim was irrelevant.

Peltier argues that the district court improperly refused to allow him to introduce evidence of

specific instances of violence, attacks on traditional Native Americans by the Goons [an acronym for the Guardians of the Oglala National, a group that opposed the AIM], attacks on AIM members and related instances of violence, intimidation by police and FBI agents and failure of police and FBI to protect traditional Native Americans and AIM members, in order to show the impact of this knowledge on his state of mind at the time of the shootout.

He acknowledges, however, that "evidence of general information about violence, attacks on AIM members and similar threatening circumstances, to be sure ... were permitted to a limited degree by Judge Benson."

In a motion in limine, the government sought to exclude evidence concerning the "alleged climate of fear and tension" that existed on the reservation prior to the murders. The district court reserved decision and made item-by-item rulings on admissibility throughout the trial. At trial, the court stated that it would allow the defense to introduce evidence relevant "to the issues and the evidence presented by the government," but that "witnesses who have testified will not be impeached by a showing of misconduct of the Federal Bureau of Investigation unless that misconduct relates to the testimony of the individual witnesses who have testified or unless that misconduct relates to exhibits that have been received in evidence." Tr. at 3458–59.

The district court admitted substantial evidence concerning the atmosphere on the reservation and the poor relations between the AIM, on the one hand, and the GOONS, the Bureau of Indian Affairs (BIA), and the FBI, on the other hand. Specifically, the district court admitted testimony about: the hostility between members of the AIM and the GOONS, tr. at 3511–12, 3594; the lack of protection the BIA police provided, tr. at 3515, 3590; the BIA police's support of the GOONS, tr. at 3517, 3627; the need for AIM members to protect themselves, tr. at 3518, 3894; the prevalence of violence on the reservation, tr. at 3593, 3626, 3842, 3884, 4229; violence by the GOONS against AIM members, tr. at 3620, 3622, 3894; and the presence of FBI agents on the reservation, tr. at 3886. The district court limited the defense to introducing only general evidence about life on the reservation "because if we allow specific incidents to be testified to, then the [government] would have a right to present evidence to show that it was not so and we would be getting into many mini-trials within the main trial." Tr. at 3907.

The court gave the jury two detailed instructions on self-defense.

The record shows that the district court admitted extensive evidence concerning the level of tension and discontent existing on the reservation in the period preceding the murders—the very evidence that Peltier claims would have supported his claim of self-defense. The court did not abuse its discretion in limiting this evidence to testimony regarding general conditions on the reservation and excluding evidence of specific incidents. *See United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 230, 60 S.Ct. 811, 847, 84 L.Ed. 1129 (1940) ("The trial court has a wide range for discretion in the exclusion of [collateral] evidence."); *Independent Iron Works, Inc. v. United States Steel Corp.,* 322

F.2d 656, 669–70 (9th Cir.), *cert. denied*, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963). The court properly did not allow the proceedings to become a general trial of the FBI and the GOONS. *Cf. Golden Reward Mining Co. v. Buxton Mining Co.*, 97 F. 413, 416 (8th Cir.1899) ("[T]estimony which does have some tendency to establish a material fact may be rejected by a trial judge, and should be rejected, when its admission will have a tendency to divert the attention of the jury from the precise issues involved in the case, and protract the trial beyond reasonable limits.").

### III

The remainder of Peltier's claims involve assertions of government misconduct that allegedly denied him a fair trial or otherwise violated his constitutional rights. The district court held that these claims were not cognizable in the section 2255 proceeding because (A) some of them had already been litigated on direct appeal or in the prior section 2255 proceeding and (B) those that had not been so litigated, should and could have been raised in the prior section 2255 proceeding.

In the present proceeding, the United States moved in the district court to dismiss parts of Peltier's application. In opposing that motion, Peltier stated that "[w]hile it is true that Mr. Peltier consistently has complained of governmental misconduct ..., he has not previously litigated [the] issue[ ]." In his brief to this court, "Appellant Peltier asserts that the entire claim of outrageous government misconduct is new."

A. Two of the five claims of government misconduct that Peltier raises in his current motion were, in fact, litigated in the prior section 2255 proceeding. These two contentions were that the government had failed to disclose to Peltier (1) a ballistics report favorable to him and (2) evidence that supported Peltier's claim that the car the FBI agents followed was a red pick up truck and not a red and white van as the government alleged.

As the district court stated in the prior section 2255 proceeding, Peltier contended there that the government improperly failed to disclose at or before trial:

(1) a memorandum indicating that tests matching the .223 shell casing found in the trunk of Agent Coler's car with Peltier's AR–15 rifle were conducted with negative results, and documents indicating that it is highly unlikely that the government's ballistics expert failed to study the .223 casing for several months; (2) FBI reports demonstrating the involvement of other vehicles in the incident, specifically a red pickup, a red Scout, a red jeep, and an orange and white pickup.

553 F.Supp. at 894.

As noted in Part I.B above, after a hearing, the district court in a lengthy opinion, concluded that, "evaluated in the context of the entire record, [the ballistics memorandum] would not have affected the outcome of the trial, and does not create a reasonable doubt that did not otherwise exist." 609 F.Supp. at 1154. We affirmed. 800 F.2d 772.

With respect to the evidence of different colored vehicles, the district court concluded:

At the time of trial, conflicting evidence was presented to the jury as to what Anderson said he saw and whether he was in a position to see the vehicle being followed by Special Agents Coler and Williams.... Petitioner has alleged the legal conclusion, unsupported by facts, that Anderson perjured himself. The arguments relating to other vehicles is [sic] but a repeat of issues presented to the jury, which issues were thoroughly argued. If there is any evidence available from which one might conclude perjury was involved, that evidence was presented to the jury or available to defendant at trial.

553 F.Supp. at 896–97. We affirmed that decision. 731 F.2d 550.

Section 2255 provides in relevant part: "The sentencing court shall not be required to entertain a second or successive motion for similar relief on behalf of the same prisoner." 28 U.S.C. § 2255 (1988). Rule 9(b) under section 2255, states:

A second or successive motion may be dismissed if the judge finds that it fails to

allege new or different grounds for relief and the prior determination was on the merits....

In *Sanders v. United States*, 373 U.S. 1, 15, 83 S.Ct. 1068, 1077, 10 L.Ed.2d 148 (1963), the Supreme Court held that

[c]ontrolling weight may be given to denial of a prior application for federal habeas corpus or § 2255 relief only if (1) the same ground presented in the subsequent application was determined adversely to the applicant on the prior application, (2) the prior determination was on the merits, and (3) the ends of justice would not be served by reaching the merits of the subsequent application.

*Id.* (footnote omitted).

As the district court noted in denying the present motion, "courts are not bound to entertain successive motions or petitions for relief which allege grounds already fully considered. *See Johnson v. Petrovsky*, 626 F.2d 72, 73 (8th Cir.1972)."

The decision in Peltier's prior section 2255 proceeding "determined adversely" to Peltier these two arguments presented in the present application, and those determinations were on the merits. As explained in Part III.B, below, Peltier's present claims also do not meet the "miscarriage of justice" standard, which is the Supreme Court's reformulation in *McCleskey v. Zant*, 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991), of the *Sanders* "ends of justice" test. The district court was fully justified in declining to consider the merits of these two claims a second time, despite their repackaging under the heading of government misconduct.

B. Peltier's three other contentions of government misconduct were not made in the prior section 2255 proceeding. Those contentions are: (1) the government induced a mentally ill woman, Myrtle Poor Bear, to falsify affidavits claiming that she witnessed Peltier kill the agents at close range, (2) the government abused, coerced and intimidated five specified trial witnesses, including Myrtle Poor Bear, and (3) prior to the murders, the FBI armed the GOONS and condoned or incited hostilities between them and the AIM, of which Peltier was a member. Pel-

tier also contends that as a result of the government's creating an atmosphere of intimidation at trial, the district court imposed excessive and prejudicial security measures.

1. In rejecting these four contentions, the district court applied the standards governing successive petitions for habeas corpus the Supreme Court recently set forth in *McCleskey*. There the Court stated that "[t]he doctrine of abuse of the writ defines the circumstances in which federal courts decline to entertain a claim presented for the first time in a second or subsequent petition for a writ of habeas corpus." *Id.* at ——, 111 S.Ct. at 1457. The Court described the standards and procedures for determining whether there had been abuse of the writ:

When a prisoner files a second or subsequent application, the government bears the burden of pleading abuse of the writ. The government satisfies the burden if, with clarity and particularity, it notes petitioner's prior writ history, identifies the claims that appear for the first time, and alleges that petitioner has abused the writ. The burden to disprove abuse then becomes petitioner's. To excuse his failure to raise the claim earlier, he must show cause for failing to raise it and prejudice therefrom.... If petitioner cannot show cause, the failure to raise the claim in an earlier petition may nonetheless be excused if he or she can show that a fundamental miscarriage of justice would result from a failure to entertain the claim.

*Id.* at ——, 111 S.Ct. at 1470.

The Court further stated:

Abuse of the writ doctrine examines petitioner's conduct: the question is whether petitioner possessed, or by reasonable means could have obtained, a sufficient basis to allege a claim in the first petition and pursue the matter through the habeas process. The requirement of cause in the abuse of the writ context is based on the principle that petitioner must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief in the first federal habeas petition. If what petitioner knows or could discover upon reasonable investigation supports a claim for relief in a federal

habeas petition, what he does not know is irrelevant. Omission of the claim will not be excused merely because evidence discovered later might also have supported or strengthened the claim.

*Id.* at ——, 111 S.Ct. at 1472 (citations omitted).

*McCleskey* involved a successive federal habeas corpus petition by a state prisoner. Peltier contends that *McCleskey* applies only to state prisoners and not to federal ones. We held, however, in *United States v. Fallon*, 922 F.2d 212, 213 (8th Cir.1993) that "[t]he *McCleskey* standard applies to § 2255 habeas petitions filed by federal inmates." *See also United States v. Flores*, 981 F.2d 231, 234–35 (5th Cir.1993) ("*McCleskey's* formulation of the abuse of the writ doctrine also governs abuse of the proceedings under section 2255.") (footnote omitted). Our ruling in *Fallon* accords with those of the four other circuits that have applied *McCleskey* to successive section 2255 petitions by federal prisoners. *Flores, supra; Campino v. United States*, 968 F.2d 187, 189 (2d Cir.1992); *Andiarena v. United States*, 967 F.2d 715 (1st Cir.1992); *United States v. MacDonald*, 966 F.2d 854 (4th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 606, 121 L.Ed.2d 542 (1992).

■ 2. Insofar as Peltier's section 2255 motion raises these four issues, it constituted an abuse of the proceedings because Peltier could and should have raised those issues in his first section 2255 proceeding. Thus, under *McCleskey*, his failure to do so there justified the district court's refusal to consider those issues in the present proceeding. Peltier knew of the existence of the facts upon which those claims were based at the time of his prior section 2255 proceeding. His failure to raise them there constituted at least the "failing to raise a claim through inexcusable neglect," *McCleskey*, 499 U.S. at ——, 111 S.Ct. at 1468, which, under *McCleskey*, constitutes an abuse of the proceeding.

The allegation that the government induced Myrtle Poor Bear to file false affidavits is not new. Indeed, that was the precise ground upon which Peltier argued in his direct appeal that his extradition from Canada violated the Webster–Ashburton Treaty. 585 F.2d at 334–35. This court rejected the contention. *Id.* The government did not call Myrtle Poor Bear as a witness at trial. Peltier attempted to introduce her testimony, but the court refused to permit it because the "credibility of this witness for any purpose is so suspect that to permit her testimony to go to the jury would be confusing the issues, may mislead the jury and could be highly prejudicial." Tr. at 4657–58. In the direct appeal, this court sustained the exclusion of her testimony. 585 F.2d at 331–32. Finally, since the allegation regarding the false affidavits of Myrtle Poor Bear related only to the propriety of the extradition of Peltier from Canada—an action that Peltier does not here challenge—the government's alleged fabrication of these affidavits is irrelevant to the validity of Peltier's conviction.

The contention that the FBI intimidated and threatened five trial witnesses (including Myrtle Poor Bear, who did not testify) was based upon testimony elicited in cross-examination at trial of some of these and other witnesses. It was all known to Peltier at that time.

As noted above, evidence was introduced at the trial about the general hostility of the GOONS toward the AIM, and the role of the FBI in furthering that hostility. The district court justifiably imposed limitations upon testimony regarding specific instances of that hostility. Peltier states that in the present proceeding, he obtained significant new evidence on this issue, namely a statement by Duane Brewer, former leader of the GOONS, describing FBI support of, and provision of weapons to, that organization. Brewer describes in great deal the history of the relationship between the GOONS and the AIM, and the FBI's support of the former.

Peltier gives no explanation, however, for his failure to obtain that evidence earlier, so that he could have used it in his prior section 2255 proceeding. Moreover, as the Court explained in *McCleskey*, "[i]f what petitioner knows or could discover upon reasonable investigation supports a claim for relief in a federal habeas petition, what he does not know is irrelevant. Omission of the claim will not be excused merely because evidence discovered later might also have supported

or strengthened the claim." 499 U.S. ——, 111 S.Ct. at 1472.

The facts upon which Peltier based his argument that the government "intentionally created an atmosphere of intimidation and fear surrounding Petitioner's trial in order to convince the jury that he was a dangerous political assassin" and "generated" a "security hysteria" all relate to what occurred at the trial. These facts were all known to Peltier at that time.

The sole ground upon which Peltier attempts to justify his failure to raise these issues in his prior section 2255 proceeding is that those issues became relevant only when the government allegedly conceded at oral argument in the prior section 2255 proceeding that the conviction could not be upheld on the theory that Peltier personally killed the FBI agents at point blank range. Peltier stated that he had no reason to raise those claims in the earlier proceedings "because there was still a judicial perception as to the existence of 'strong evidence' that he fired the fatal shots."

Our holding that the prosecutor's statement at oral argument that "we can't prove who shot those agents" did not have the meaning that Peltier attributes to it and that the case was tried and submitted to the jury on the alternative theories that Peltier either himself committed the murders or aided and abetted their commission, destroys the foundation of Peltier's attempted justification for his failure to raise the issues earlier. In holding "as a matter of law" that Peltier "has failed to meet his burden of establishing cause for failure to raise these issues either on appeal or in his first petition," the district court correctly concluded that "these are issues which [Peltier] chose not to raise in earlier proceedings."

■ 3. *McCleskey* recognized an exception to the abuse of the writ doctrine: in a "narrow class of cases," 499 U.S. at ——, 111 S.Ct. at 1470, courts will consider whether, even though the petitioner did not raise the issue in the prior proceeding, there has been a miscarriage of justice that calls for judicial intervention. The exception is an extremely narrow one, however: to be cognizable, the alleged constitutional violation must have "caused the conviction of one innocent of the crime," *id.*, and the petitioner bears the burden of proving that the violation "caused the conviction of an innocent person." *Id.* at ——, at 1475.

We agree with the district court that Peltier has failed to show that the refusal to consider the merits of his contentions would result in a miscarriage of justice under the *McCleskey* standard. As the district court stated:

> The issues of over-zealous security and even the other government misconduct issues such as surveillance of the defense team, attempting to influence the trial judge, and fabrication of evidence to obtain petitioner's extradition, although they are alleged to have affected the outcome, do not tend to establish innocence, and therefore, are not entitled to be heard notwithstanding petitioner's failure to establish cause for not raising these claims earlier.

■ 4. In *McCleskey*, the Court held that "[t]he petitioner's opportunity to meet the burden of cause and prejudice will not include an evidentiary hearing if the district court determines as a matter of law that petitioner cannot satisfy the standard." *Id.* at ——, 111 S.Ct. at 1470. The district court properly determined, as a matter of law, that Peltier did not satisfy the *McCleskey* standard, and, therefore, correctly dismissed the section 2255 proceeding without an evidentiary hearing.

## IV

■ An "*ad hoc* group of 49 Members of the Parliament of Canada" submitted as amici curiae a brief and presented oral argument challenging the legality of Peltier's extradition from Canada in 1976. Amici argue that the extradition was obtained by fraud because the United States government presented the Canadian extradition court with false affidavits by Myrtle Poor Bear. They urge this court either to set aside Peltier's conviction or to return him to Canada for a proper extradition determination.

We decline to consider this issue for three reasons.

First, extradition is a matter handled between governments, not by private parties. *See, e.g.,* Restatement (Third) of the Foreign Relations Law of the United States § 476 cmt. a (1986) ("obligations in an extradition treaty run from state to state"); *id.* § 478 cmt. a ("Extradition is a matter between states, and a foreign state seeking extradition from the United States should apply to federal authorities."). As far as we are aware, the Canadian government has not protested to the government of the United States the handling by the United States of Peltier's extradition from Canada. Although the amici are members of the Canadian Parliament, they do not purport to participate here on behalf of the Canadian government. They do not state that their amicus participation in this appeal is pursuant to authorization by the Canadian Parliament.

As far as we can tell, the amici are here solely as individual members of the Canadian Parliament to protest what they believe to have been improper conduct by the United States in connection with Peltier's extradition. In that capacity, they do not speak for the Canadian government. *See President of the United States ex rel Caputo v. Kelly,* 92 F.2d 603, 605 (2d Cir.1937) ("[e]xtradition proceedings must be prosecuted by the foreign government in the public interest, and may not be used by a private party for private vengeance or personal purposes"), *cert. denied,* 303 U.S. 635, 58 S.Ct. 521, 82 L.Ed. 1096 (1938).

Second, in this appeal Peltier does not challenge his extradition from Canada, although he did so in the direct appeal from his conviction. "Ordinarily, we consider only issues argued in the briefs filed by the parties and not those argued in the briefs filed by interested nonparties." *Continental Ins. Cos. v. Northeastern Pharmaceutical & Chem. Co., Inc.,* 842 F.2d 977, 984 (8th Cir.) (citation omitted), *cert. denied sub nom. Missouri v. Continental Ins. Cos.,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988). *See also Kamen v. Kemper Fin. Servs., Inc.,* —— U.S. ——, —— n. 4, 111 S.Ct. 1711, 1716 n. 4, 114 L.Ed.2d 152 (1991) ("we do not ordinarily address issues raised only by *amici* "); *United Parcel Serv., Inc. v. Mitchell,* 451 U.S. 56,

60 n. 2, 101 S.Ct. 1559, 1562 n. 2, 67 L.Ed.2d 732 (1981) ("We decline to consider [the argument raised by amici] since it was not raised by either of the parties here or below.").

Third, the contention comes far too late. The facts relating to the Myrtle Poor Bear affidavits were developed at the time of Peltier's 1977 trial. We rejected Peltier's challenge to his extradition, based on the falsity of the affidavits, in affirming his criminal conviction on direct appeal in 1978. The amici have offered no justification for their delay in raising the issue.

V

Peltier makes a number of other contentions, none of which requires discussion. We have considered them all, but they are unpersuasive.

The judgment of the district court is affirmed.