**UNITED STATES of America, Appellee,**

v.

**Leonard PELTIER, Appellant.**

**National Association of Criminal Defense Lawyers, Inc. and California Attorneys for Criminal Justice, Amicus Supporting Appellant**

**Cathedral Church of St. John the Divine, et al., Amicus**

**Certain Members of U.S. Congress, Amicus Supporting Appellant.**

**No. 85–5192.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 15, 1985.

Decided Sept. 11, 1986.

William Kunstler, New York City for appellant.

Lynn E. Crooks, Asst. U.S. Atty., Fargo, N.D., for appellee.

Before HEANEY, ROSS, and JOHN R. GIBSON, Circuit Judges.

HEANEY, Circuit Judge.

On April 18, 1977, Leonard Peltier was found guilty of the June 26, 1975, premeditated murder of Jack Coler and Ronald Williams, special agents of the Federal Bureau of Investigation (FBI). The record as a whole leaves no doubt that the jury accepted the government's theory that Peltier had personally killed the two agents, after they were seriously wounded, by shooting them at pointblank range with an AR–15 rifle (identified at trial as the "Wichita AR–15").[1] The critical evidence in support of

---

**1.** The prosecution made the following statements in its closing argument:

[W]e have submitted strong circumstantial evidence which indicates that Leonard Peltier

this theory was a casing from a .223 caliber Remington cartridge recovered from the trunk of agent Coler's car on June 29, 1975, and received by the FBI firearms identification expert on July 24, 1975. The district court, agreeing with the government's theory of the case, sentenced Peltier to two consecutive life sentences.

Peltier appealed to this Court from that conviction. He argued strenuously that he had not been given a fair trial because the trial court refused to permit him to fully explore his contention that the FBI had manufactured evidence against him and had intimidated and coerced several witnesses. He also argued that the district court erred in denying him the right to introduce evidence regarding the tensions between the FBI and the American Indian Movement (AIM) on the Pine Ridge Indian Reservation, and had erred in permitting introduction of prejudicial and inflamatory evidence. Peltier also objected to the manner in which the district court handled the ballistic evidence, particularly insofar as that evidence was intended to show his possession and use of the Wichita AR–15 on the day the two agents were killed. He

finally complained that the government had deliberately withheld exculpatory information from the defense and that the trial court had erred in failing to do anything about this failure.

We affirmed the conviction on September 14, 1978. *United States v. Peltier*, 585 F.2d 314 (8th Cir.1978), *cert. denied*, 440 U.S. 945, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979). In affirming, we too accepted the government's theory that both agents had been killed with a high-velocity small-caliber weapon fired at pointblank range at a time when the men were seriously wounded and unable to defend themselves. We then held that the evidence was sufficient for the jury to find Peltier responsible for the murders.

On April 20, 1982, Peltier filed a motion to vacate the judgment and for a new trial pursuant to 28 U.S.C. § 2255 (1976). On December 15, 1983, he filed a second motion for a new trial under Fed.R.Crim.P. 33. The basis of this motion was a mass of data and reports obtained from the FBI under a Freedom of Information Act, 5 U.S.C. § 552 (1982) (FOIA) request. He simultaneously moved to disqualify the dis-

did in fact fire the fatal shots; but you need not believe that he did. I think that he did, and I think the evidence shows he did.
Tr. at 4974.
The evidence * * * indicates that Leonard Peltier was not only the leader of this group, he started the fight, he started the shootings and that he executed these two human beings at point blank range.
Tr. at 4975–76.
Out of all the individuals who were involved there was one individual who was most responsible, and I think the evidence without any question proves and establishes beyond any doubt that that was * * * Leonard Peltier.
Tr. at 4976.
Apparently Special Agent Williams was killed first. He was struck in the face and hand by the bullet, as I have demonstrated, probably begging for his life, and he was shot. The back of his head was blown off by a high-powered rifle.
Leonard Peltier then turned, as the evidence indicates, to Jack Coler lying on the ground helpless. He shoots him in the top of the head. Apparently feeling that he hadn't done a good enough job, he shoots him again through the jaw, and his face explodes.

Tr. at 4996.
The prosecution concluded its argument with the following statement:
I think my argument can be summed up in a very brief paragraph.
We have proved the cold-blooded, brutal murder of two human beings. We have proved that beyond any question. We have proved it was premeditated, planned in the sense that it was not a spur of the moment activity. We have proved beyond a reasonable doubt that Leonard Peltier was responsible for these senseless, brutal, cowardly murders. We have proved that beyond any doubt. We have proved that he organized and directed this camp, started the fight, fired at the agents again and again from the treeline.
Had we proved nothing further, that in itself would have been first degree murder; but in addition, we proved that he went down to the bodies and executed these two young men at pointblank range. Ladies and gentlemen, that's murder in the first degree. The United States respectfully requests that you return a verdict of guilty on both charges of this indictment.
Tr. at 5019.

trict court judge. The district court denied all motions without an evidentiary hearing. Peltier appealed, arguing that many of the documents received under the FOIA request were exculpatory and should have been made available to him under the dictates of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, Peltier argued that the government had improperly withheld information tending to show that the agents had not in fact been killed by the Wichita AR–15. We recognized that the evidence relating to Peltier's use of the Wichita AR–15 on June 26th was critical to his conviction and remanded the matter to the district court for an evidentiary hearing. We stated:

> At this hearing, the court shall limit its consideration to any testimony or documentary evidence relevant to the meaning of [an] October 2, 1975, teletype [which seemed to rule out the Wichita AR–15 as the murder weapon] and its relation to the ballistics evidence introduced at Peltier's trial. The court shall then rule on whether the evidence adduced below supports Peltier's contention that its nondisclosure violated the *Brady* doctrine, requiring a new trial.

*United States v. Peltier,* 731 F.2d 550, 555 (8th Cir.1984) (per curiam).

The district court conducted an evidentiary hearing on the matter and issued a detailed memorandum and order on May 22, 1985. 609 F.Supp. 1143. It held that the October 2, 1975, teletype, evaluated in the context of the entire record, would not have affected the outcome of the trial and that, therefore, Peltier was not entitled to relief.

Peltier appeals to this Court, asking us to make an independent judgment as to whether the previously undisclosed evidence would have produced a different result at trial.

**The Legal Standard.**

In *United States v. Bagley,* —— U.S. ——, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), Mr. Justice Blackmun, writing for the Court, reviewed the Supreme Court cases dealing with a prosecutor's failure to disclose evidence that could have been used effectively to impeach important government witnesses. He stated:

> In *Brady v. Maryland,* 373 U.S. 83, 87 [83 S.Ct. 1194, 1196, 10 L.Ed.2d 215] (1963), this Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment."
>
> \* \* \* \* \* \*
>
> The holding in *Brady v. Maryland* requires disclosure only of evidence that is both favorable to the accused and "material either to guilt or punishment."

*Id.,* 105 S.Ct. at 3377, 3379, 87 L.Ed.2d at 486, 489 (citations omitted).

He went on to state:

> Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule. See *Giglio v. United States,* 405 U.S. 150, 154 [92 S.Ct. 763, 766, 31 L.Ed.2d 104] (1972). Such evidence is "evidence favorable to an accused," *Brady,* \* \* \* so that, if disclosed and used effectively, it may make the difference between conviction and acquittal. *Cf. Napue v. Illinois,* 360 U.S. 264, 269 [79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217] (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend").
>
> \* \* \* \* \* \*
>
> [C]onstitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial.

*Id.,* 105 S.Ct. at 3380–81, 87 L.Ed.2d at 490–91.

He then turned to the question of materiality, and stated that:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the

result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

\* \* \* \* \* \*

[T]he more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption. This possibility of impairment does not necessitate a different standard of materiality, however, for under the Strickland formulation the reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case. The reviewing court should assess the possibility that such effect might have occurred in light of the *totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response.*

*Id.,* 105 S.Ct. at 3383, 87 L.Ed.2d at 494 (emphasis added).

After setting out the legal standard, the Court remanded the matter to the Court of Appeals for its determination whether there was a reasonable probability that had the evidence of the inducement offered by the government to two government witnesses been disclosed to the defense, the result of the trial would have been different.

Applying the rules set forth in *Bagley* to this case, we find that the prosecution withheld evidence from the defense favorable to Peltier, and that had this evidence been available to the defendant, it would have allowed him to cross-examine certain government witnesses more effectively. This case thus turns on the question whether the evidence withheld by the prosecution is material in the sense that its nondisclosure undermines confidence in the outcome of the trial.

We could have resolved this issue without great dificulty if the government had presented the case against Peltier on the theory that he was an aider and abettor. The evidence clearly shows that Peltier participated in the shoot-out that resulted in the wounding and ultimate deaths of the two FBI agents. But this is not the government's theory. Its theory, accepted by the jury and the judge, was that Peltier killed the two FBI agents at pointblank range with the Wichita AR–15. Under this theory, the ballistics evidence, particularly as that evidence relates to a .223 shell casing, allegedly extracted from the Wichita AR–15 and found in agent Coler's car, is critical. We thus must examine the evidence that surfaced after trial to determine whether, in the light of that new evidence and the totality of the circumstances, there is a reasonable probability that the jury would not have found Peltier guilty of the two murders if it had known all the facts. We do so with an awareness of the difficulty of reconstructing the course the defendant would have taken if the withheld evidence had been available to him at trial.

### The .223 Casing.

■ As the government states, the .223 casing found in the trunk of Coler's car was "perhaps the most important piece of evidence in this case." Tr. at 4996. While the autopsies indicated only that the agents had been killed pointblank by a high-velocity low-caliber weapon, the .223 casing pinpointed the Wichita AR–15 as the murder weapon, to the exclusion of all other weapons. Since other evidence connected Peltier to the Wichita AR–15, the .223 casing provided the final link necessary to establish Peltier as the pointblank murderer of both agents.[2]

---

**2.** Since the autopsies showed that three pointblank shots were fired, the single casing establishes only an inference that Peltier fired all

three shots. The government argues that Peltier and his accomplices found and carried off the other two casings from the Wichita AR–15. We

Questions regarding the FBI's handling and examination of the casing first arose at trial due to inconsistencies in the laboratory reports. A February 10, 1976, laboratory report made by Evan Hodge, the government's ballistics expert, stated that the .223 casing found in Coler's trunk had been loaded and extracted from the Wichita AR–15. In contrast, Hodge's October 31, 1975, report stated that "[n]one of the other ammunition components recovered at the RESMURS scene could be associated with [the Wichita AR–15]." At the time of this earlier report, Hodge had both the .223 casing and the Wichita AR–15 in his possession.[3]

At the post-trial evidentiary hearing, Hodge explained that at the time he wrote the October 31 report, he had only examined a small portion of the submitted ballistics evidence, and that he had not gotten to the .223 casing until December, 1975, or January, 1976. He further testified that he had not been aware of any particular urgency connected with the casing, and had not received any priority requests regarding it. This testimony is facially inconsistent with the newly-discovered evidence, which included several teletypes from FBI officials and agents specifically requesting Hodge to compare submitted AR–15 rifles with .223 casings found at the scene,[4] and Hodge's responses to these teletypes, which, at least prior to February 10, 1975, consistently reported that the casings and rifles were nonidentical.[5] Additionally, from the FOIA request documents, the defense discovered that Hodge had ample reason to focus his attention on the .223 casing. He was aware as early as June 27, 1975, the day after the killings, that the two agents had been killed by a high-velocity low-caliber weapon at close range,[6] and by September 20, 1975, that the investigation had focused on Peltier and an AR–15.[7]

---

note that the evidence supports the view that there was at least one other AR–15 on the compound on the day of the murders. *See infra* at 779. If Peltier and his associates carried away the casings from the Wichita AR–15 to prevent their use as evidence it is just as logical to assume that they carried away casings from another AR–15.

**3.** Hodge received the casing on July 24, 1975, and the Wichita AR–15 on September 12, 1975.

**4.** In the July 21, 1975 "airtel" accompanying the shipment of evidence which included the .223 casing found in Coler's trunk, the Rapid City FBI agency stated that "[t]he cartridges should be compared with weapons received, re: RESMURS, and with other weapons related to RESMURS in an attempt to connect the cartridges with specific weapons." Evidentiary hearing exhibit D–20. In a September 15, 1975, memorandum accompanying evidence recovered on the Rosebud Reservation, the Minneapolis agency asked the laboratory "to test fire enclosed weapons [including an AR–15] and compare slug with slugs recovered from [unknown subject] crimes." Evidentiary hearing exhibit D–24. In a September 20, 1975, teletype to the lab, the Rapid City agency reported that it had information that Peltier had used the AR–15 found on the Rosebud Reservation to kill the agents, and stated that "[t]he Bureau laboratory is requested to conduct all logical examinations of the weapons submitted to them in referenced communications." Evidentiary hearing exhibit D–14. In

a September 27, 1975, teletype, the Rapid City agency asked the laboratory to compare certain casings with the Wichita AR–15. Evidentiary hearing exhibit D–32. On this same date, the Rapid City agency sent another teletype requesting the laboratory to "make available to Rapid City a supplemental and confirming report to include all results of comparisons, examinations, tests, analyses, and restorations not previously reported." Evidentiary hearing exhibit D–15. On October 2, 1975, a teletype from Rapid City to the laboratory stated: "Laboratory requested to compare all .223 casings with AR–15 rifle * * * located at Al Running's property * * *." Evidentiary hearing exhibit 6.

**5.** In an October 2, 1975, teletype to Rapid City, the laboratory reported: "Recovered .223 caliber colt rifle received from SA Gammage, BATF, contains different firing pin than that in rifle used at RESMURS scene." Evidentiary hearing exhibit 4. A November 24, 1975, teletype from the laboratory to the Portland and Rapid City agencies reported that "[c]artridge cases fired in submitted weapons in laboratory were compared with like caliber cartridge cases recovered at RESMURS scene and it was concluded that these two rifles, in their present conditions, could not have fired any of the recovered specimens." Evidentiary hearing exhibit D–22.

**6.** Evidentiary hearing exhibit 13.

**7.** Evidentiary hearing exhibit D–14.

The question now before us is whether the newly-discovered evidence indicating Hodge may not have been telling the truth, considered in the light of the evidence the jury had before it, would have caused the jury to reach a different result. While that possibility exists, *Bagley* requires more. It requires us to find that it is reasonably probable the jury would have acquitted Peltier had it been aware of this evidence, and had the defense had an opportunity to question Hodge about the inconsistencies. Recognizing the difficulty of putting ourselves in the position of the jury, we hold that it probably would not have acquitted him. One of our sources of discomfort with our decision is that although the defense was aware at trial of the inconsistencies, it was not able to demonstrate their importance because of an evidentiary ruling by the district court.[8] If the newly discovered evidence had been available at trial, the district court's ruling might very well have been different. In any event, the defense would have had substantial additional documentary evidence upon which to cross-examine Hodge, and would have had greater reason to pursue the inconsistencies more vigorously than it did.

When all is said and done, however, a few simple but very important facts remain. The casing introduced into evidence had in fact been extracted from the Wichita AR–15. This point was not disputed; although the defense had its own ballistics expert, it offered no contrary evidence. Peltier raises general questions regarding the handling and examination of the .223 casing and the Wichita AR–15, but does not make specific allegations of tampering. There are only two alternatives, however, to the government's contention that

---

8. The district court's evidentiary ruling clearly hampered the defense in its efforts to point out the inconsistencies in the October 31, 1975, and February 10, 1976, lab reports. Although both reports were admitted into evidence, the Court refused to allow defense counsel to mention the dates of the reports or any inferences to be drawn from the dates in his argument to the jury. *See* Tr. at 4701. Since the primary impeachment value of the reports is that their timing creates an inference that the FBI lab may have changed its conclusion concerning the relation of the .223 casing found in Coler's trunk to the Wichita AR–15 only after it appreciated the alleged connection between the shell, the Wichita AR–15 and the murders, the argument foreclosed by the ruling could have been significant.

The district court based its ruling upon Fed.R. Evid. 613(b). That rule prohibits admission of extrinsic evidence of a prior inconsistent statement by a witness unless the witness has an opportunity to explain or deny the inconsistent statement, and the party opposing admission of the inconsistent statement is afforded an opportunity to interrogate the witness concerning the statement. *See Nebraska Public Power District v. Borg Warner Corp.*, 621 F.2d 282, 497 (8th Cir.1980). Rule 613(b), unlike prior practice, does not require the proponent of the inconsistent statement to direct the witness's attention to the inconsistency and afford an opportunity for explanation. All that is required is that the witness have an opportunity to explain. As Judge Weinstein states: "The rule does not indicate that the party introducing evidence of the inconsistent statement must afford the witness an opportunity to explain. It merely indicates that the witness must be afforded that opportunity." 3 Weinstein and Berger, Weinstein's Evidence 613–24 (Bender 1986).

The record indicates that the defense complied with the requirements of rule 613(b). While Hodge, the agent in charge of preparing the lab reports, was testifying, defense counsel announced his intention to introduce the October 31, 1975 lab report into evidence. At this point, the prosecution knew of the inconsistency in the reports. In fact, the inconsistency arose in the trial of Butler and Robideau the preceding summer. Tr. at 4705. Moreover, the prosecutor even gave Hodge an opportunity to explain the inconsistency during his redirect examination:

Q. [D]o you remember when it was approximately that you began to examine that particular item along with other items in the shipment of items with which it came to Washington?

A. Yes. It was about the end of 1975, beginning of 1976; January, December, in that area.

Tr. at 3388.

Thus, not only was the prosecution afforded ample opportunity to explain or deny the inconsistency, it did, in fact, elicit testimony from Hodge seeking to show that the inconsistency was a result of Hodge's failure to have examined all of the evience at the time he wrote the October 31, 1975 report.

Reviewing the record we can discern nothing in Fed.R.Evid. 613(b) that would serve as a basis for refusing to allow the defense to mention the dates of the inconsistent reports or to argue any inferences that could be drawn from these reports to the jury.

the .223 casing was ejected into the trunk of Coler's car when the Wichita AR–15 was fired at the agents. One alternative is that the .223 casing was planted in the trunk of Coler's car either before its discovery by investigating agents or by the agents who reported its discovery. The other alternative is that a non-matching casing was originally found in the trunk and sent to the FBI laboratory, only to be replaced by a matching casing when the importance of a match with the Wichita AR–15 became evident. We are not convinced that either alternative is likely. The discovery of a .223 casing in the trunk of Coler's car was documented in a contemporaneous report. That report listed dozens of other items that were found in Coler's car on the same date. The detailed nature of that report makes it highly unlikely that it was fabricated. Not only is there no direct evidence that the .223 casing found in the trunk was replaced by another casing, the internal operating procedures of the FBI with respect to the preservation of evidence makes it unlikely that such replacement could occur without massive collusion. We recognize that there is evidence in this record of improper conduct on the part of some FBI agents, but we are reluctant to impute even further improprieties to them.

**The AR–15.**

We turn now to the question of whether the jury might have reached another result had it been able to consider the government's testimony with respect to the number of AR–15's on the compound on June 26, 1975, in light of the newly-discovered evidence just discussed. It was essential to the government's case that it prove Peltier was in possession of the Wichita AR–15 on June 26th, and used that weapon to kill Coler and Williams. The government recognizes this fact in its brief.

As a starting point in analyzing what the evidence produced at the hearing establishes one must first ascertain what is ultimately at issue concerning the match between Exhibits 34A [the Wichita AR–15] and 34B [the .223 casing found in the trunk of Coler's car]. What ultimately was proven by Special Agent Hodge's positive comparison of the extractor marks? * * * [H]is conclusion only establishes that Exhibit 34B at some point in time was loaded into and extracted from Exhibit 34A. His conclusion does not establish directly that that shell casing was fired by that weapon. It, likewise, does not establish by itself any connection between either Exhibits 34A or 34B and Leonard Peltier. * * * The match of the extractor marks between that shell casing and an AR–15 found in a burned vehicle on the Kansas Turnpike fairly conclusively established that point since there was no indication that either agent ever previously had access to that weapon. The inference which then arose, of course, was that since the agents received their final wounds as a result of close range fire in the area of Special Agent Coler's car, the shell casing had been ejected into the trunk as a result of one of the final shots.

That inference standing alone, however, proved nothing concerning Leonard Peltier. He was not in the vehicle which exploded near Wichita and there was no direct evidence, such as fingerprints, which made a connection between he and the weapon. The only indirect connection between Peltier and the weapon was that it was in the custody of his friends and associates. The connection between Peltier and the Wichita AR–15, Exhibit 34A, rather, was established by the trial witnesses. The trial witnesses unanimously testified that there was only one AR–15 in the compound prior to the murders, that this weapon was used exclusively by Leonard Peltier and was carried out by him after the murders. The trial witnesses also testified unanimously that there was only one weapon which was seen firing at the agents that day which was capable of firing .223 ammunition and that this weapon was the AR–15 being utilized by Leonard Peltier. * * * The necessary further inference, therefore, was that Leonard Peltier's weapon was fired down in the area where the two dead agents were found. While

these inferences do not necessarily establish that Leonard Peltier personally fired any of the final killing shots, they do indicate very strongly that he was down by the bodies when the shot was fired. These inferences were, of course, strengthened by the trial testimony that Leonard Peltier was one of only three individuals seen down by the bodies that day.

Appellee's Brief pp. 30–32.

■ We turn first to the question of whether there was only one AR–15 on the compound on June 26. The answer to that question must be no. Hodge testified that among the one hundred and thirty-seven .223 casings found on the compound within a few days of the agents' deaths were fourteen that could not be identified as having been fired from the Wichita AR–15. Seven of these cartridges, Q100–Q105, and Q130 were found by special agent Hughes in the green house area. These cartridges were the very ones that were examined by Hodge by August 5, 1975, and were the subject of the October 2, and October 31, 1975, reports. The remaining seven, Q2513–2519, were found in Tent City, and were the subject of Hodge's February 26th report. Tr. at 3323–34.

Notwithstanding the obvious error in the government's position, there are several reasons we have reservations as to whether the newly-discovered evidence probably would have caused the jury to reach a different result. First, the defendants knew at trial that fourteen .223 casings found on the compound did not match the Wichita AR–15. Hodge testified to that fact at trial. He even testified that he didn't know whether the fourteen had been extracted from the same weapon. The defendant, however, failed to emphasize this point in his closing argument.

Second, it is unlikely that the fourteen casings were extracted from an AR–15 during the fire fight with agents Coler and Williams. The green house and Tent City

were physically located such that it would have been very difficult, if not impossible, for anyone to have fired at Coler and Williams from these points. Thus, it is more likely that these casings were ejected from an AR–15 in the fire fight that occurred after Coler and Williams were killed and other agents had joined in the shooting.

Third, Norman Brown testified that he saw Peltier firing a weapon from the treeline similar to the one introduced into evidence: "Well, * * * he was laying down and he'd get up and shoot, and then he'd lay back down and get up and shoot, and lay back down." Tr. at 1446. Michael Anderson testified that he saw Peltier at the agents' cars and that Peltier was carrying a weapon similar to the one introduced in evidence. Tr. at 788. Moreover, no witness testified that anyone other than Peltier was seen firing an AR–15 at the agents' cars, or that anyone other than Peltier was seen by the agents' cars with an AR–15.

In the light of the full record, the jury might have given additional weight to the fact that there was more than one AR–15 on the compound on June 26 had the inconsistencies in the ballistic evidence introduced at trial been supplemented with the reports and data discovered after trial. Moreover, under such circumstances it might have given more serious consideration to the possibility that an AR–15 other than the Wichita AR–15 was used in the murder of either Coler or Williams,[9] but we cannot say that it is reasonably probable that it would have been sufficiently impressed by these possibilities to have reached a different result at trial.

**Conclusion.**

There is a *possibility* that the jury would have acquitted Leonard Peltier had the records and data improperly withheld from the defense been available to him in order to better exploit and reinforce the inconsistencies casting strong doubts upon the

9. We note that the defense did not, for reasons which are not apparent, stress in its cross-examinations or closing argument that there was

more than one AR–15 on the compound on June 26.

government's case. Yet, we are bound by the *Bagley* test requiring that we be convinced, from a review of the entire record, that had the data and records withheld been made available, the jury *probably* would have reached a different result. We have not been so convinced.

Affirmed.