**UNITED STATES of America**

v.

**Jose Antonio PINEDA.**

**No. 4:98–CR–3.**

United States District Court,
E.D. Texas,
Sherman Division.

July 26, 1999.

Carol Kay Johnson, Assistant United States Attorney, Sherman, TX, for plaintiff.

John Thomas Haughton, Haughton & Wang, Aubrey, TX, for defendant.

### *MEMORANDUM*

COBB, District Judge.

The United States Court of Appeals for the Fifth Circuit has remanded this case to this court to make findings upon defendant's motion for new trial which defendant asserts is based upon newly discovered evidence. *United States v. DeVoe,* 489 F.2d 158 (5th Cir.1974). This court may not grant a new trial following the hearing, but may deny it. *United States v. Fuentes–Lozano,* 580 F.2d 724 (5th Cir. 1978). The court held:

> We have also approved of this procedure. *United States v. Smith,* 433 F.2d 149, 152 (5th Cir.1970) (district court

should determine "whether it should advise the appellate court that it is disposed to grant the motion for new trial if the appellate court will entertain a suggestion for remand"); *United States v. Hersh*, 415 F.2d 835, 837 (5th Cir. 1969) ("while the district court did not have the power to grant the motion pending appeal, it did have the jurisdiction to consider appellant's motion and the power to deny it"); *Richardson v. United States*, 360 F.2d 366, 368 (5th Cir.1966) (Rule 33 "expressly precludes the granting of such a motion absent remand by the appellate court; however, [the trial court's] power to deny the motion is beyond doubt.")

.    .    .    .    .

Because the procedure followed here conforms to the procedure approved in *Johnson* (although only a "temporary remand" rather than an unconditional remand is sought, we grant the motion). However, in order to clarify the appropriate procedure, we again affirm the authority of our prior decisions in *Smith, Hersh* and *Richardson*. A motion for a new trial may be presented directly to the district court while the appeal is pending; that court may not grant the motion but may deny it, or it may advise us that it would be disposed to grant the motion if the case were remanded. Alternatively, as here, to avoid delay, the appellant may seek a remand for the purpose of permitting the district fully to entertain the motion.

The court has held that hearing, and neither the government nor the defendant offered any testimony, or called any witnesses, or produced any other evidence at all. Both parties have submitted briefs and requested a decision on the motion for new trial only upon the briefs. The court is not willing to rely only on the briefs, and has required that the entire trial record, the videotapes in question, and the tape logs be produced, all of which concerned events occurring at a park in McKinney, Texas, November 23, 1997, the day the

defendant and others were arrested. The court has now reviewed the entire record of the trial, the videotapes, and surveillance logs.

### Background

On December 10, 1997, a criminal complaint was filed against Antonio Pineda (hereafter Antonio Pineda or defendant), charging him with possessing with the intent to distribute a controlled substance, heroin, in violation of 21 U.S.C. § 841(a)(1). On December 18, 1997, Antonio Pineda appeared with counsel, John Haughton, for a preliminary hearing before United States Magistrate Judge Robert Faulkner. The magistrate judge found probable cause and bound over Antonio Pineda to answer to the grand jury.

On January 15, 1998, a federal grand jury in the Eastern District of Texas returned a two-count indictment against Antonio Pineda and co-defendants Salvador Contreras Pineda (Antonio Pineda's brother) and Ecliserio Martinez–Garcia. Salvador Pineda was charged in Count 1 with on or about November 4, 1997, possessing with intent to distribute more than 100 grams of black tar heroin, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The three co-defendants were charged in Count 2 with possessing with intent to distribute more than 500 grams of black tar heroin on November 23, 1997 (21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2). The defendants were arraigned January 29, 1998, and entered pleas of not guilty. Trial was scheduled to begin on March 3, 1998.

Before trial, Salvador Pineda and Ecliserio Martinez–Garcia pleaded guilty to the charges in the indictment. On March 17, 1998, Antonio Pineda proceeded to trial and the jury returned a guilty verdict on Count 2 on March 19, 1998.

A Presentence Report ("PSR") was prepared April 23, 1998. Based on a total offense level of 26 and a criminal history category of 1, the guideline range of imprisonment was 63 to 78 months. On June

29, 1998, Antonio Pineda was sentenced to 63 months imprisonment to be followed by 4 years of supervised release. Notice of appeal was timely filed on June 29, 1998.

While Antonio Pineda's first conviction was on appeal, a federal grand jury in the Eastern District of Texas returned a thirty-six count indictment against twenty-nine defendants. The indictment was returned on June 24, 1998. Antonio Pineda was charged in Counts 1, 28, and 36 of the indictment with conspiracy to violate Title 21, United States Code, § 841(a)(1) and possession with the intent to distribute heroin and cocaine. Once again, his attorney was John Haughton.

Antonio Pineda was not charged in the June 24, 1998, indictment with the substantive counts alleged in the previous January 15, 1998, indictment. However, the substantive counts from the January 15, 1998, indictment were listed as overt acts of the conspiracy in Count 1 of the June 24, 1998, indictment.

Pursuant to discovery orders, the United States provided discovery under both the first (January 15, 1998) and second (June 24, 1998) indictments. Antonio Pineda was provided with a video surveillance tape as part of the discovery under the second (June 24, 1998) indictment. Antonio Pineda was not provided with a copy of the said video surveillance tape as part of the discovery under the first (January 15, 1998) indictment probably because the Assistant United States Attorney handling the first indictment was not aware of the existence of the said video tape.[1]

Antonio Pineda entered a plea of guilty before United States Magistrate Judge Robert Faulkner to Count 1 of the second indictment. The magistrate judge's recommendation and report was accepted by the trial judge, the Honorable Richard A. Schell.

On March 11, 1999, the United States Court of Appeals for the Fifth Circuit remanded Antonio Pineda's appeal of his conviction under the first (January 15, 1998) indictment to the United States District Court to make findings of fact of Antonio Pineda's request for a new trial which he based upon newly discovered evidence.

### The Trial

In October 1997, David Cordova, a DEA agent working undercover out of Dallas, Texas, was introduced to Salvador Pineda, a Mexican citizen in the United States illegally, by another undercover narcotics investigator. Cordova, of Hispanic descent, and who speaks fluent Spanish, posed as a high level heroin trafficker looking for a new source of black tar heroin in Texas. On November 4, 1997, Salvador, who went by the name "Chino," sold Cordova 5 ounces of black tar heroin for $11,000.00. After that sale, Cordova made arrangements to buy 20 ounces from Salvador for $40,000.00. The telephone calls and meetings between Salvador and Cordova setting up the deal were recorded. The cassette tapes were transcribed and translated into English. In a call on November 18, Salvador told Cordova that he was going to Mexico soon and that someone else was coming into the organization to take his place.

Salvador and Cordova met at a Wendy's parking lot in Allen, Texas, on November 21, where Salvador told Cordova that he already had 10 ounces of black tar heroin and was waiting for an additional 10 ounces to complete the sale. They arranged to meet again at Wendy's on November 23 when Salvador would take Cordova to a park in McKinney, Texas, to make the exchange. Salvador said that his brother was coming from Minnesota on the morning of November 23, and he wanted Cordova to meet him because Salvador was going to leave his brother in charge

---

1. At the time the AUSA, Carol Johnson, in Sherman, Texas, was preparing this case, AUSA Bill Baldwin, from Tyler, Texas, was conducting a Grand Jury investigation and it is believed that he had the video and transcripts that are the subject of this appeal.

while he went to Mexico for a short period of time.

Salvador called Cordova on the morning of November 23 to make final arrangements to meet at Wendy's at noon. Surveillance was set up at the park and Salvador's residence at 211 Walnut Street in McKinney, Texas. Salvador picked up his brother Antonio, who was accompanied by his wife and child, at the Dallas–Fort Worth airport before 9:00 a.m., and brought them back to the house at 211 Walnut. Just before noon, three vehicles, a white Pontiac Grand Am, a white Buick Regal, and a maroon van, each with a single occupant, proceeded from the residence to a parking lot at the Town Lake Park in McKinney, Texas.

Salvador left his brother Antonio Pineda at the park and drove either the Buick Royal or the Grand Am to Wendy's to meet Cordova.[2] At their meeting at Wendy's, when Cordova asked Salvador where the additional 10 ounces of heroin was located, Salvador replied, "My brother is over there with the stuff." During the 30 to 40 minutes that Salvador was away from the park, Antonio sat or stood near a bench about 60 to 80 yards from the Grand Am in the parking lot. According to the government witnesses, Antonio had been given the keys to the Grand Am by Salvador, and kept them in his pocket while he watched the car during Salvador's absence. Co-defendant Martinez–Garcia drove off in the van at the same time Salvador left in a white two-door car, but arrived back at the park a short time before Salvador while Antonio remained at the park bench, or nearby.

When Cordova arrived at the park in his car following Salvador, Salvador whistled and gestured for Antonio to come over to the two cars. Salvador introduced Antonio to Cordova as his brother. Antonio then gave Salvador the keys to the Grand Am. Salvador opened the driver's door and pulled out a Crown Royal bag containing 20 ounces of black tar heroin. Salvador unlocked the passenger door and Cordova momentarily sat down before telling Salvador that he was going to get the money. Instead Cordova got out of the car and made a prearranged arrest signal and the three men were arrested without incident. The drugs seized tested out to be heroin hydrochloride with a net weight of 505.9 grams and 69% purity.[3]

### The Trial–Defense

After entering guilty pleas to the charges in the indictment, Antonio Pineda's co-defendants both testified at trial that appellant knew nothing about their drug dealing. Salvador admitted that he had told Cordova that his brother was coming down to take over his business, but he explained that was merely a pretext, just something he told Cordova. Salvador claimed he was only a courier for the larger drug dealer named "Marcos" who had delivered the Grand Am containing the black tar heroin to Salvador's house on the morning of November 23. Salvador and Ecliserio Martinez–Garcia testified that they drove to the park in separate cars, but as far as Antonio was concerned he was on vacation and the only reason he went to the park was to play volleyball. No one ever carried or showed up with any

**2.** FBI Agent William Meredith followed the three vehicles from Salvador's residence but did not see who drove the Grand Am from the house to the park. He testified that he saw Salvador drive the Grand Am (which was very similar in appearance to the Buick) to Wendy's in contradiction testimony of DEA Agent Victor Routh.

**3.** Recovered in a subsequent search of Salvador's residence at 211 Walnut in McKinney were additional quantities of heroin, cocaine, and marijuana, along with $29,000.00 in cash, a drug ledger, gold jewelry, and several guns, including an AR–15 assault rifle, a Browning .380 automatic pistol and a Lorcin .25 automatic pistol, all fully loaded. Discovered in a shed on the property were drug packaging materials, an electronic scale, and items used to smuggle heroin across the border, which included hollowed out boot heels and four pairs of boots with the hollow heels.

volleyball equipment, nor was any seen by any witness.

### The Videotape

The video tape in question started at shortly after 7:00 a.m. on November 23. Although some distance from the house at 211 Walnut Street in McKinney, it fairly depicts the front of the house, and several cars nearby, the front porch, and various individuals leaving and entering the front door.

Two white cars can be seen from time to time, a maroon van, a gray sedan, and through trees, portions of the driveway.

After the three cars left 211 Walnut Street shortly before noon, there is nothing on the tape for several minutes, and then the tape mainly shows only one car at the park, then a short span showing two other cars driving out of camera range. The tape does not show who drove the cars. The various tapes viewed by me are of extremely poor quality. Apparently the tape in the park was taken from a stationary vehicle, but over-exposed to the light available so that the cars are not readily identifiable, and the features of the outside characteristics of the cars are not clearly discernable, if at all. The faces of the drivers are not identifiable. At all times, the license plates which should have been readable are completely blurred and cannot be read. There are two males who appear, apparently Antonio Pineda and Salvador Pineda. The maroon van, due to the poor quality of the tape, (possibly due to over-exposure), appears to be a pinkish gray. It is extremely difficult to believe the tape would be determinative of anything, except possibly there were three automobiles, and two of them left the places where they were parked (one of the white cars appears to have been moved twice). The tape does not show the cars leaving the park, nor their return. It does not show what Antonio Pineda did for the 30–40 minutes Antonio Pineda was in the park before his brother Salvador returned, nor the transfer of keys after he returned, or anything after the two cars were moved. The log is equally unhelpful, except that when the trio of cars left 211 Walnut Street, the Grand Am, apparently driven by Salvador, led the way to the park, followed by the Buick and the maroon van.

The best that can be said for the tapes is that Agent Meredith was correct, and Agent Routh was wrong. That conflict was forcefully brought out in testimony by the defendant's attorney in cross-examination.

In the trial on March 17, 1998, Agent Cordova testified that he never saw the defendant operate the Grand Am and never saw Antonio Pineda in the Grand Am. Agent Bill Meredith, the agent in charge of surveillance from the residence to the park was unable to identify the driver of the Grand Am to the park on November 23, 1997, but specifically stated that Salvador Pineda operated the Buick from the park to Wendy's, the place where he met the undercover agent, on November 23, 1997. This testimony of the government's witnesses was contradicted by the government's third witness, DEA Agent Victor Routh, who was conducting surveillance in the park (but not in McKinney) prior to and at the time of the drug transaction. Agent Victor Routh testified he observed the defendant drive the white Grand Am to the park on that day, and not the Buick Regal. Agent Routh did not take the videotape in the park, but another state or local officer apparently did.

According to the defendant's brief, defendant alleges the video tape surveillance and transcript shows that apparently Agent Routh was not testifying accurately. The video shows a man wearing a blue striped shirt at 7:05 a.m. on November 23, 1997, the day of the transaction. The transcript of the video, report No. 7, states that this person has been previously identified as "M–2," which indicated he had been seen prior to this date and time. FBI Agent Meredith, the government's witness, testified that he had maintained

surveillance on Salvador Pineda, the defendant's brother, beginning at 5:30 a.m. on November 23, 1997. Meredith stated that he followed Salvador Pineda to DFW Airport at about 7:15 a.m. At the airport Salvador and another male picked up a third male, a woman and a child, and returned to 211 Walnut Street. The transcript notes that at 9:13 a.m., the minivan returned with all five subjects and designates the new male as M–5.

Near noon on November 23, the video of 211 Walnut Street shows three vehicles leaving the house, which Agent Meredith stated all three went to the park. The transcript states that M–2 departs in the Grand Am and M–5 (presumably Antonio Pineda), left in the Buick Regal.

Agent Routh stated that the defendant walked to the park bench while Eclesario Martinez–Garcia and Salvador Pineda left the park. Routh further stated that he observed the defendant at the park bench for 30–40 minutes until Salvador Pineda returned to the park. Agent Routh testified that he believed that the defendant was conducting "counter-surveillance." Agent Routh stated that when Salvador Pineda and Agent Cordova returned to the park Salvador Pineda waved to the defendant to join Salvador Pineda and Agent Cordova at the Grand Am. At that time he testified the defendant handed a set of car keys to Salvador Pineda who used them to open the car.

### Legal Standard

■ The legal test of motion for new trial on the ground of newly discovered evidence is whether the new evidence "would probably produce a different verdict in the event of a retrial," and not that it "could have" done so.

Defendant's brief seeks a new trial on the wrong legal basis. For instance, defendant asserts "If this evidence was presented to the jury the outcome *could* have been different." (Defendant's brief, p. 6). And:

This video evidence is material because when coupled with Agent Meredith's testimony that a co-defendant left the park in the Grand Am to meet the undercover agent the jury *could have concluded* that the Defendant never had dominion and control over the car containing the heroin.

(Defendant's brief, p. 8). Further:

[B]ut had the jury known that Agent Routh was wrong about who drove the Grand Am to the park then they *could also have* chose to disregard Agent Routh's testimony about counter-surveillance.

(Defendant's brief, p. 8).

This is the incorrect standard to be applied by the trial court. The Supreme Court in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) in asserting the failure of the government to furnish allegedly possible exculpatory evidence prior to trial, held the court of appeals applied the wrong test when the lower court held:

The Court [of Appeals] found no lack of diligence on the part of the defense and no misconduct by the prosecutor in this case. It held, however, that the evidence was material, and that its nondisclosure required a new trial *because the jury might have returned a different verdict* if the evidence had been received.

(p. 102.)

Further:

It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered there is no justification for a new trial.

(pp. 112–113).

In *Agurs*, the trial court had reviewed the entire record, and based upon that review held the evidence (prior arrest rec-

ord of deceased) was "cumulative," was not of a "material" nature which required a reversal.

Further, in this opinion written by Justice Stevens, the Court discussed the requirements of the government to produce evidence helpful to a defendant. The Court said:

> Whether we focus on the desirability of a precise definition of the prosecutor's duty or on the potential harm to the defendant, we conclude that there is no significant difference between cases in which there has been merely a general request for exculpatory matter and cases, like the one we must now decide, in which there has been no request at all. The third situation in which the Brady rule arguably applies, typified by this case, therefore embraces the case *in which only a general request for "Brady material" has been made*. (Emphasis furnished)

(p. 107).

> In *United States v. Garner* 529 F.2d 962 (6th Cir.1976), the Sixth Circuit held: Motions for a new trial are not favored and are granted only with great caution. *United States v. Hoffa*, 382 F.2d 856, 862 (6th Cir.1967), *cert. denied*, 390 U.S. 924, 88 S.Ct. 854, 19 L.Ed.2d 984 (1968). To warrant the ordering of a new trial the newly discovered evidence must be not merely cumulative or impeaching in character, but *must be such that it would probably produce a different verdict in the event of retrial*. *United States v. McCoy*, 478 F.2d 846 (4th Cir. 1973); *United States v. Kahn*, 472 F.2d 272 (2d Cir.), *cert. denied*, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973). In this case it is conceded that the evidence would be of value only to impeach the chief Government witness; in addition, *the evidence is not such that it would probably produce a different verdict in the event of a retrial*. (Emphasis furnished)

*See also United States v. Fowler*, 735 F.2d 823 (5th Cir.1984), where it was held:

> Finally, the appellants maintain that the trial court erred in denying their motion for new trial based on newly discovered evidence. Such motions are disfavored by the courts and therefore are viewed with great caution. *United States v. Vergara*, 714 F.2d 21, 22 (5th Cir.1983). Thus, the district court's denial of a new trial will be reversed only where a clear abuse of discretion is demonstrated. *Id.* at 23. A defendant who challenges the trial court's denial of the motion has the burden of showing that: (1) the evidence was discovered following trial, (2) the failure to learn of the evidence was due to no lack of due diligence on the part of the defendant, (3) the evidence is not merely cumulative or impeaching, (4) the evidence is material, *and* (5) *the evidence is such that a new trial will probably produce an acquittal*. *Id.; see Bentley v. United States*, 701 F.2d 897, 898 (11th Cir.1983); *United States v. Burns*, 668 F.2d 855, 859 (5th Cir.1982).

Again, in *United States v. Peltier*, 800 F.2d 772 (8th Cir.1986), that court said:

> There is a *possibility* that the jury would have acquitted Leonard Peltier had the records and data improperly withheld form the defense been available to him in order to better exploit and reinforce the inconsistencies casting strong doubts upon the government's case. Yet, we are bound by the *Bagley* test requiring that we be convinced, from a review of the entire record, that had the data and records withheld been made available, *the jury probably would have reached a different result*. We have not been so convinced. (Emphasis furnished)

The same test was applied by the Fifth Circuit in *United States v. Snoddy*, 862 F.2d 1154, 1157 (5th Cir.1989), and *United States v. Lopez–Escobar*, 920 F.2d 1241 (5th Cir.1991), where the Court said:

Although the shell casings have impeachment value, this evidence relates only in a peripheral way to the facts on which the conviction is based. "Whether this newly obtained evidence would have been helpful to the defense is not ... the standard by which we decide to grant a new trial." *Snoddy*, 862 F.2d at 1156. The jury may have disbelieved the agent's testimony about the firing of weapons but still have convicted Lopez–Escobar.

### Discussion

■ Defendant asks the court for a new trial because subsequent to trial, he learned of a video tape that was made while agents surveilled the outside of 211 Walnut, McKinney, Texas, on November 23, 1997, and the defendant was not provided with a copy of said tape prior to trial in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Defendant states that said video surveillance tape was material to his defense in that it could have been used to impeach the testimony of Special Agent Victor Routh.

■ In a motion for a new trial, the defendant has the burden of showing that (1) the evidence was unknown to him at the time of trial and was only discovered following trial, (2) the failure to learn of the evidence was due to no lack of due diligence on his part, (3) the evidence is not merely cumulative or impeaching, (4) the evidence is material, and (5) the evidence is such that a new trial will probably produce an acquittal. *United States v. Lopez–Escobar*, 920 F.2d 1241, 1246 (5th Cir.1991); *United States v. Fowler*, 735 F.2d 823, 830 (5th Cir.1984). The defendant must meet each of the above requirements before his motion for new trial can be granted. *Lopez–Escobar* at 1246. Defendant in this case has failed to prove that the evidence presented in his motion for a new trial is material, not merely cumulative or impeaching, or that it would probably produce an acquittal.

As noted above, neither the government nor the defendant produced any witnesses, affidavits, nor any other evidence explaining the absence of the tapes pursuant to the discovery order. Again, briefs only were submitted. The court requested, and the defendant's attorney sent a copy of the entire trial transcript. The court obtained from the government's attorney the tape and logs. Thus, this court must rule on the motion for new trial despite extreme paucity of any evidence about the tapes, and their poor quality.

Defendant claims that the surveillance video tape impeaches the testimony of DEA Special Agent Victor Routh. It is not clear that the surveillance video impeaches Special Agent Routh. Special Agent Routh testified to events that took place *after* the surveillance video was terminated. The surveillance video shows a white car (probably a Pontiac Grand Am) leaving 211 Walnut, McKinney, Texas, being driven by a person wearing what appears to be a striped shirt. The transcript of said video states that the person in the striped shirt has been previously identified. Because the person wearing the striped shirt was previously identified, the defendant claims there is an inference that the person wearing the striped shirt could not be Antonio Pineda because he arrived in Texas the same day the video tape was made and therefore, could not have been previously identified.

Special Agent Bill Meredith (FBI) testified he conducted surveillance on the Grand Am from 211 Walnut to the park but he could not tell who was driving the white Grand Am at that time. Special Agent Meredith then testified that he saw Salvador Pineda *leave* the park in the white Buick Regal.

Special Agent Routh was doing surveillance at the park where the buy-bust was to take place, and not at 211 Walnut Street in McKinney, Texas. Special Agent Routh testified that he saw Antonio Pineda driving a white Grand Am into the park and

saw Salvador Pineda driving a white Buick Regal into the park.

Special Agent Meredith testified that he could not tell who was driving the white Grand Am but he says he followed them to the park. Special Agent Routh, who was at the park, then testified that he saw Antonio Pineda driving the white Grand Am into the park. Although inferences could be drawn based upon the video tape, it is certainly not clearly impeaching evidence of what happened at the park when Salvador Pineda returned. What occurred at 211 Walnut on the videotape was not part of the crime which occurred at the park after the video tape terminated.

Assuming *arguendo* that the video surveillance tape does impeach Special Agent Routh, newly discovered evidence which merely impeaches a witness will not meet the defendant's burden on a motion for a new trial.

In *United States v. Garner,* the court held that a new trial was not justified on the grounds of newly discovered evidence where proffered testimony to the effect that the chief prosecution witness had offered to pay two individuals to corroborate his testimony could be used only to impeach and therefore the defendant was not entitled to a new trial. *United States v. Garner,* 529 F.2d 962 (6th Cir.1976), *cert. denied,* 426 U.S. 922, 96 S.Ct. 2630, 49 L.Ed.2d 376.

Just as in *Garner,* in the case currently before this court, the video surveillance tape serves to merely impeach a witness on an event that took place at 211 Walnut in McKinney, Texas, *before* the crime took place at the park. The defendant has not met his burden of showing that the video tape does more than merely impeach a witness.

Not only has the defendant not met his burden on the motion for new trial by showing that the newly discovered evidence is more than merely impeaching, the defendant has not shown that the new evidence would "*probably produce* an ac-

quittal." Although the "probably produce an acquittal" standard is used in motions for a new trial, it should be noted that in cases where the defendant has not been provided with favorable evidence, the Fifth Circuit has applied a reasonable likelihood or reasonable probability that the defendant would have been acquitted had the newly discovered evidence been produced.

In *United States v. Peltier,* 800 F.2d 772 (8th Cir.1986), *cert. denied,* 484 U.S. 822, 108 S.Ct. 84, 98 L.Ed.2d 46, the prosecution withheld evidence favorable to the defendant which would have allowed the defendant to more effectively cross-examine the government's ballistic's expert regarding a .223 casing found in the trunk of the car of a murdered FBI agent. *Id.* The *Peltier* court held that the withheld evidence did not create reasonable probability that the defendant would have been acquitted if the evidence would have been disclosed, therefore, the defendant was not entitled to a new trial. *Id.*

In the case before this court, the disclosure of the video surveillance tape would not have created a reasonable probability that the defendant would have been acquitted. The witness the defendant would have impeached was already impeached by another agent and the government presented a strong case that even if the defendant was not driving the Grand Am, he was acting as a look-out during the time Salvador was gone.

The impeachment value of the tapes, to the extent they would aid the defendant, are cumulative of the fact that Meredith (FBI) places the defendant driving the Buick Regal from 211 Walnut to the park, but Routh places his brother Salvador behind the wheel of the Buick when it left 211 Walnut for the trip to Town Lake Park. The tapes are inconclusive. The crucial testimony was what Antonio Pineda did at the park. The prosecution witnesses all testified consistently on this point. The one person remaining at the park apparently watching the Grand Am was Antonio. No volleyball or net was

ever seen. The "chain of events" clearly showed that Salvador and Martinez–Garcia left and Antonio remained in the sight of the Grand Am. The testimony showed that when Salvador returned, Antonio brought the Grand Am keys to him, and the buy-bust arrest ensued. If the tapes contradict and impeach Routh, so did Agent Meredith. The tapes, to the extent they are indicative of anything, which is unclear, indicate that Meredith's identification of who left 211 Walnut in the Buick was right. At most, it is cumulative of the defendant's cross-examination of Routh which contradicted and impeached Routh.

Thus, the witness that the video tape would have impeached (Special Agent Victor Routh) was impeached or contradicted on that very issue by Special Agent William Meredith. Special Agent Routh testified Salvador Pineda left the park in a white Grand Am. Consequently, the witness the defendant sought to impeach was in fact impeached or contradicted by another government agent. What happened in the park was the material part of this trial, and a mistaken identification by one agent of one of two white General Motors' two-door cars driven to the park has not been shown to be of such a magnitude to require a new trial, especially in view of what was presented to this court at defendant's hearing on his motion for new trial.

█ While any exculpatory evidence in the possession of any government agency may be deemed available to the prosecutor, and the evidence should have been turned over to the defendant's attorney, such a failure does not *per se* require a new trial. Of the various cases cited in the briefs before me, and other cases found by the court, the test announced in *United States v. Antone,* 603 F.2d 566 (5th Cir. 1979), and *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), cited above, hold the test should be that the newly discovered evidence "must be such that it would probably produce a different verdict in the event of retrial." (Citing cases).

In this case, I find that the government's case was extremely strong, and the two witnesses' testimony concerning Antonio Pineda's lack of knowledge is as unpersuasive to this court as it was to the jury.

To outline those facts:

1) Salvador Pineda sold black tar heroin to Cordova on November 4, 1998.

2) Salvador told Cordova his brother was arriving from Minnesota to take over his operation for a short period of time during his prospective trip to Mexico.

3) Arrangements were made to sell 20 ounces of black tar heroin to Cordova on November 23, 1998.

4) Antonio arrived at DFW from Minnesota in the early morning of November 23.

5) To be picked up by Salvador.

6) After Antonio and his family were picked up, all went to 211 Walnut in McKinney at approximately 9:15 a.m.

7) Various cars came and went from the Walnut Street house on this particular morning.

8) Three cars with the two Pineda brothers and Martinez–Garcia proceeded to the park around noon.

9) Salvador and Martinez–Garcia left in separate cars shortly after arriving at the park.

10) Salvador met Cordova at Wendy's in Allen to "finalize" the heroin transaction.

11) They returned to the park after the Wendy's meeting, at which Salvador told Cordova the remaining 10 ounces were obtained, and "My brother is over there with the stuff."

12) Upon their return to the park, Salvador got the keys from Antonio who had remained at the park, opened the car (the white Grand Am) and Cordova briefly got in the car, and

13) After Salvador showed Cordova 20 ounces of heroin in a Crown Royal bag,

14) Exited the car and gave the arrest signal.

15) From the time Antonio left the Walnut Street house, he remained in sight of the Grand Am, and remained near or within sight of it for 30–40 minutes in the park during the Wendy's trip by his brother.

16) The participants "went to play volleyball" without a ball or a net.

The less than helpful tapes, as stated above, have been reviewed numerous times. They could only have established at the very best, that Antonio drove a Buick *to the park,* and Routh erroneously said it was a white Grand Am, but the tapes I viewed are certainly less than iron-clad that such was the case.

### *Conclusion*

For the reasons set forth in this Memorandum, and my review of the entire trial testimony, as well as my independent recollection of the trial, the witnesses, their credibility, and the inconclusive nature of the video tapes, I am of the opinion that the "newly discovered" evidence would not "probably produce a different verdict in the event of a retrial."

Accordingly, the defendant's motion for new trial is OVERRULED and DENIED.